Case 09-35981-bjh11 Doc 144 Filed 12/30/09 Entered 12/30/09 15:02:42 Page 1 of 18


**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed December 30, 2009**                                    **United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| **TEXANS CUSO INSURANCE GROUP,** § | **CASE NO. 09-35981-BJH-11** |
| **LLC,** § | |
| § | |
| Debtor. § | |

### MEMORANDUM OPINION AND ORDER

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

    **A.    Debtor's Purchase of Curley Insurance Group, LLC from Kevin Curley and the Ensuing Litigation**

On January 3, 2007, Kevin Curley ("Curley") sold the assets of Curley Insurance Group, LLC

("CIG") to Texans CUSO Insurance Group, LLC (the "Debtor" or "Texans") and Texans CUSO

Partners, LLC [1] under the Amended and Restated Asset Sale and Purchase Agreement ("ARAPA").

---

[1] Texans CUSO Partners, LLC, is an affiliate entity of the Debtor.

**Memorandum Opinion and Order**

Pursuant to the ARAPA, the Debtor assumed the operations of CIG, with Curley to manage and direct those operations during a three-year "earn-out" period (January 1, 2007 to December 31, 2009) specified in the ARAPA and in a separate employment agreement (the "Employment Agreement") between the Debtor and Curley (the "Earn-Out Period"). The purchase price for CIG was composed of an initial cash payment of $19 million to be paid by Texans CUSO Partners, LLC, plus an additional amount of up to $21 million to be paid in three annual earn-out payments calculated pursuant to a formula based upon the Debtor's earnings and revenue growth during the Earn-Out Period. For each year of the Earn-Out Period, the Debtor was to calculate the amount due under the formula and deliver its calculation to Curley within 45 days after the close of the year. Disputes under the ARAPA and the Employment Agreement were to be resolved by binding arbitration.

On April 27, 2007, less than four months into the first year of operations under these agreements, the Debtor terminated Curley's employment. Curley disputed the appropriateness of his termination. Pursuant to the ARAPA, the parties entered into binding arbitration on this issue and the arbitrator returned an award finding that Curley had been terminated without cause and was therefore entitled to reinstatement with back pay and benefits (the "Employment Arbitration Award"). On August 4, 2008, Curley filed suit in state district court to confirm the arbitration award and to recover attorneys' fees and expenses (the "State Court Action"). The parties continued to litigate their disputes in the State Court Action throughout 2008 and into the summer of 2009.

**B.     Dispute over the Year 1 Earn-out Calculation**

As noted previously, the first year of the Earn-Out Period ran from January 1, 2007 to December 31, 2007. On February 29, 2008, the Debtor informed Curley that its calculation of the earn-out payment for the first year under the ARAPA (the "Year 1 Earn-Out Payment") was zero.

Curley objected to the Debtor's calculation and invoked the arbitration provision. On October 29, 2008, the parties entered into an agreement (the "Letter Agreement") with Financial Reporting Advisors, LLC ("FRA"), a mutually agreed-upon neutral accountant, to determine the Year 1 Earn-Out Payment (the "Accounting Arbitration"). On June 16, 2009, Amy Ripepi (the "Neutral Accountant"), managing director of FRA, issued a determination that the Year 1 Earn-Out Payment under the ARAPA was $6,282,870.19 (the "Accounting Arbitration Award"). On June 19, 2009, Curley filed an application in the State Court Action to confirm the Accounting Arbitration Award, while the Debtor filed an Application to Vacate or Modify the Accounting Arbitration Award. The parties were set for trial in the State Court Action on Curley's claims in relation to the Employment Arbitration Award and the Accounting Arbitration Award on November 9, 2009.

      **C.**      **Debtor's Chapter 11 Petition and Motion to Estimate Claims**

On September 5, 2009, the Debtor filed a voluntary petition under Chapter 11 in this Court, which stayed the State Court Action. At a hearing held on November 11, 2009, the Court granted the Debtor's motion to estimate the amount of Curley's claims under 11 U.S.C. § 502(c). Pursuant to the estimation procedures ultimately agreed upon by the parties, Curley filed a Response to Debtor's Application to Vacate or Modify the Accounting Arbitration Award on December 3, 2009, to which the Debtor filed a Reply on December 7, 2009. The issue now before the Court is whether the Accounting Arbitration Award should be confirmed.

**II.**      **ACCOUNTING ARBITRATION AWARD**

      **A.**      **Background: the Contingent and Supplemental Commissions**

The controversy over the Accounting Arbitration Award centers on the proper treatment under the ARAPA earn-out formula of payments received by the Debtor in 2007 in connection with

incentive programs referred to as "Contingent" and "Supplemental" commissions (the "Contingent Commissions" and "Supplemental Commissions," respectively) implemented by St. Paul Travelers Companies, Inc. ("Travelers"). As used by the parties in this context, the term "Contingent Commissions" refers to payments received by Texans that relate to the Travelers incentive program in effect during 2006, while "Supplemental Commissions" are payments made under a replacement program initiated by Travelers in 2007. *See, e.g.*, Response to Application to Modify or Vacate Arbitration Determination, at 1. Because the Year 1 Earn-Out Payment is tied directly to growth in revenues from 2006 to 2007, the allocation of these commissions has a dramatic effect on the amount of the Year 1 Earn-Out Payment. Specifically, depending on the treatment of these commissions, it appears that Curley is owed either $6,282,870.19 or nothing for the Year 1 Earn-Out Payment.

> **B. Calculation and Recording of the Contingent Commissions and Supplemental Commissions**

Unlike normal commissions, the amount of the Contingent Commissions and the Supplemental Commissions due from Travelers was not tied to individual policies sold by agents such as CIG (pre-sale) and the Debtor (post-sale). Instead, under the terms of the Traveler's 2006 Contingent Commissions incentive program, the amount of commissions payable to CIG or the Debtor was calculated upon a variety of factors including:

- the dollar volume of premiums written during the contract year;
- growth in the annual volume of written premiums between the contract year and the prior year; and
- Traveler's claims or loss experience applicable to the specific policies placed during the contract year.

Under this program, Travelers only established the appropriate commission percentage factor to be applied after the close of the contract year and then paid the amount due in one lump sum. Thus, Contingent Commissions attributable to 2006 were only paid in 2007. Because of this, the amount of Contingent Commissions that an agent would receive could not be reasonably estimated during the contract year, even though all of the actions required of the agent would have been fully performed during that time. In accord with generally accepted accounting principles ("GAAP") and industry practice, both CIG and the Debtor only recorded Contingent Commissions as income when they became fixed and determinable, which was upon receipt. Thus, the Debtor recorded the Travelers 2006 Contingent Commissions as revenue in its 2007 GAAP financial statements (when it received payment for those commissions), even though the level of Contingent Commissions was calculated on the basis of premiums written by CIG in 2006.

As a result of a settlement of lawsuits alleging bid-rigging and anti-trust violations brought by several states' attorneys general, Travelers discontinued the Contingent Commissions program in January 2007 and replaced it with the Supplemental Commissions program. Supplemental Commissions were calculated by applying a pre-determined, fixed percentage to the dollar amount of all premiums written during the contract period. Typically, the amount of the fixed percentage to be applied was based upon the agent's prior sales volume, growth, and profitability of past policies sold. Because the percentage was known in advance, however, the amount of Supplemental Commissions due to the agent could be reasonably estimated during the contract year, even though the amount was not paid until after the close of the year. As a result, in accord with GAAP and industry practice, the Debtor recorded the Travelers 2007 Supplemental Commissions in its 2007 GAAP financial statements.

### C. The Parties' Dispute Over Proper Allocation of the Contingent Commissions and the Supplemental Commissions Under the ARAPA and the Neutral Accountant's Determination

The crux of the dispute as to the allocation of the Contingent Commissions and the Supplemental Commissions arises from the parties' disagreement over the correct interpretation of sections 3.1(c) and 3.2(a)(iv) of the ARAPA, which provide in relevant part:

> [Buyer's] Revenue for the purpose of calculating the Earn Out Payments will include commissions and fee income, including contingent and profit share revenue, less commissions paid to outside agents, brokers or agencies generated by the Buyer [i.e., Debtor].

ARAPA section 3.1(c).

> Notwithstanding anything in the foregoing to the contrary, the accounting for any account for purposes of determining the Year 1 Earn Out EBITDA, the Year 2 Earn Out EBITDA and the Year 3 Earn Out EBITDA shall be done in such a manner as to prevent any commissions which are recognized for accounting purposes in one year from being counted in two years and in such a manner as to prevent two years of commissions for any such account as being recognized for accounting purposes in any one year.

ARAPA section 3.2(a)(iv).

The Debtor took the position that these provisions required the Contingent Commissions to be counted in CIG's 2006 revenue and earnings for purposes of the earn-out calculation because: (i) they were generated by Curley before the sale occurred, and thus excluded from 2007 revenue by ARAPA section 3.1(c); and (ii) the inclusion of the entire amount of the Contingent Commissions and the Supplemental Commissions received in 2007 resulted in counting commissions attributable to multiple years in one year in violation of ARAPA section 3.2(a)(iv). Debtor's Initial Submission to Neutral Accountant, at 18-22 (App. R. 0038-0042). The Debtor's reference to ARAPA section 3.1(c) in its Initial Submission was terse, with most of its discussion directed toward section

**Memorandum Opinion and Order** 6

3.2(a)(iv). *See* Initial Submission, at 18-19 (App. R. 0038-0039). However, the Debtor more fully developed this argument in its subsequent submissions to the Neutral Accountant:

> The [Contingent Commission] revenue was collected in cash by Texans during 2007 and recorded as revenue in Texans 2007 income statement. But the CIG actions prerequisite to earning [the Contingent Commissions] occurred ***exclusively during 2006***, culminating with Travelers' recording, during 2006, of the written premiums Travelers used as the basis for their determination of the [Contingent Commissions]. Consequently inclusion of Travelers' [Contingent Commission] payments in 2007 revenues when determining Year 1 Earn Out EBITDA, in effect, rewards the Sellers, in the form of additional purchase price consideration, for the generation of written premiums attributable to insurance policies sold during 2006-prior to the date the acquisition was consummated.

Debtor's Responses to Questions Posed by the Neutral Accountant, at 12 (App. R. at 2282)(bold and italics in original). *See also*, Debtor's Final Submission to the Neutral Accountant, at 3-4 (App. R. at 2846-47) ("Indisputably the 2006 contingent commissions which Travelers and other accounts paid to Texans during 2007 ***were not generated by Texans (the Buyer)*** and thus, under the express terms of [ARAPA] Section 3.1(c), are not to be included in Revenues for the purpose of calculating any of the Earn Out Payments.") (bold, italics, and underline in original).

In the Accounting Arbitration Award, however, the Neutral Accountant agreed with Curley's contention that section 3.2(a)(iv) did not apply to the Contingent Commissions and the Supplemental Commissions, based upon her finding that the term "account" as contemplated by the ARAPA referred only to "customers" or "clients," meaning purchasers of insurance policies, and did not include insurance carriers such as Travelers, who were held to be more akin to "suppliers" of the business. Accounting Arbitration Award, at 9. Further, the Neutral Accountant found that, despite their nomenclature, the Contingent Commissions and the Supplemental Commissions were "more representative of a profit-sharing arrangement … or a performance bonus program" than true

commissions, since the payments were not tied to the policy of any individual client. *Id.* at 10. The Neutral Accountant also noted that the Travelers' incentive programs that generated the Contingent Commissions and the Supplemental Commissions used eligibility standards and payment multipliers based on both current and historical performance. *Id.* at 10 n.16. Although the Neutral Accountant cited and interpreted section 3.1(c) on another point of dispute, the Neutral Accountant did not cite or discuss section 3.1(c) in the explanation of her determination in regard to the Contingent Commissions and the Supplemental Commissions. *See id.* at 8 - 10; and at 12 -15.

In response to its receipt of the Accounting Arbitration Award, in a letter dated June 19, 2009, the Debtor objected that the Neutral Accountant had not adequately addressed its argument based on ARAPA section 3.1(c), and requested that the Neutral Accountant provide her rationale on this point, along with an explanation of how the Neutral Accountant defined and applied the term "generated." Debtor Response Letter (App. R. 2895-2898). The Neutral Accountant replied on June 25, 2009, stating that her findings were complete and in compliance with the arbitration agreement between the parties. Neutral Accountant Reply Letter (App. R. 2899-2900). In her reply, the Neutral Accountant noted that the arbitration agreement did not require "a written rejection or acceptance of every individual argument or position taken by each party on every disputed item," and that the Debtor's own Initial Submission stated that the central issue in the dispute over the Contingent Commissions and the Supplemental Commissions related to section 3.2(a)(iv). *Id.*

### III. CONTENTIONS OF THE PARTIES

Curley contends that, as a final and binding arbitral award, the Accounting Arbitration Award should be confirmed because no grounds exist to vacate or modify the award under either the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16 (the "FAA") or the Texas General Arbitration Act, TEX.

**Memorandum Opinion and Order**                                                                                                       8

CIV. PRAC. & REM. CODE ANN. §§ 171.001-171.098, (the "TGAA"). *See* Response to Application to Modify or Vacate Arbitration Determination, at 15-17.

In contrast, the Debtor argues that the relevant provisions of the FAA and TGAA require that the Neutral Accountant's findings be: (i) modified because the inclusion of the Contingent Commissions and the Supplemental Commissions in 2007 revenue is an evident miscalculation, or (ii) vacated because the Neutral Accountant exceeded her powers, or so imperfectly or incompletely executed her duties that a mutual, final, and definite award was not made. Application to Modify or Vacate Arbitration Determination, at 7-8. Assuming the Debtor's calculations are correct, modification or vacatur would yield an equal result for Curley, since, as modified, the Year 1 Earn-Out Payment would be zero. *See* Application to Modify or Vacate Arbitration Determination, at 7 and Exhibit A to Application to Modify or Vacate Arbitration Determination.

## IV. LEGAL ANALYSIS

### A. Applicable Law

The threshold question is to determine what standard governs the validity of the Accounting Arbitration Award. Although section 3.2(a)(iv) of the ARAPA is silent as to the rules that are to apply to the Neutral Accountant's determination, the agreement specifies that the governing law of the agreement as a whole is Texas law. ARAPA, § 12.7. Similarly, the provisions of the agreement that concern disputes as to the amount of assets and liabilities to be assumed at closing specify only that the Commercial Arbitration Rules of the American Arbitration Association will apply. ARAPA, § 3.3(b).

Where an agreement contains a clause that designates Texas law but does not exclude the FAA, the FAA and Texas law, including the TGAA, apply concurrently. *Freudensprung v. Offshore*

*Technical Servs., Inc.*, 379 F.3d 327, 338 n.7 (5th Cir. 2004). Thus, because no section of the ARAPA excludes the FAA, both the FAA and the TGAA govern whether the Accounting Arbitration Award should be confirmed, modified, or vacated.

### B. Judicial Review of Arbitration Awards Generally

A court must confirm an arbitration award unless grounds exist to vacate, modify, or correct its terms. 9 U.S.C. § 9; TEX. CIV. PRAC. & REM. CODE § 171.087. Judicial review of an arbitration award is "exceedingly deferential," and the award must be upheld if it "is rationally inferable from the letter or purpose of the underlying agreement." *Am. Laser Vision, P.A. v. Laser Vision Inst., Ltd. Liability Co.*, 487 F.3d 255, 258 (5th Cir. 2007) (per curiam) (quoting *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 352 (5th Cir. 2004) and *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164-65 (5th Cir. 1998)). The party moving to vacate an arbitration award has the burden of proof, and the court must resolve any doubts or uncertainties in favor of upholding the award. *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 385, n.9 (5th Cir. 2004). Importantly, questions of contract interpretation must be decided in favor of the arbitration decision. *Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 405 (5th Cir. 2007) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598-99 (1960) ("[I]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different than his.")); *see also Pacesetter Pools, Inc. v. Pierce Homes, Inc.*, 86 S.W.3d 827, 833 (Tex. App. 2002) ("[A] trial court reviewing an arbitrator's award may not substitute its judgment for the arbitrator's merely because it would have reached a different decision.").

In regard to the FAA, the Fifth Circuit has recognized that following the Supreme Court's decision in *Hall Street Associates, Ltd. Liability Co. v. Mattel, Inc.*, 552 U.S. 576 (2008), the statutory bases listed in 9 U.S.C. § 10(a) are the exclusive grounds for vacatur under the FAA. *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 356 (5th Cir. 2009). As discussed more fully below, however, the Debtor has not put forward any non-statutory grounds for modification or vacatur under either the FAA or the TGAA.

    C.    **Debtor's Arguments to Modify or Vacate the Accounting Arbitration Award**

        1.    **Modification**

The Debtor's argument for modification relies upon the equivalent provisions of the FAA and the TGAA that provide that an arbitration award may be modified or corrected when the award contains "an evident miscalculation of figures." *See* 9 U.S.C. § 11(a); TEX. CIV. PRAC. & REM. CODE § 171.091(a)(1)(A). An "evident material calculation" occurs "where the record that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award." *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 214 (5th Cir. 1993). In this context, a fact is "undisputed" if there is no rational basis for questioning its truth. *Id.* Further, a "miscalculation" must truly be a mistake of oversight or inadvertence, and not merely the result of the arbitrator's rejection of a proponent's argument or proposed remedy. *Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 436 (Tex. App. 2004) (arbitrator's refusal to discount award to present value as proposed by party was not evident miscalculation).

Here, the Debtor identifies no mistake of inadvertence or oversight, nor any error of undisputed fact, but instead asserts only that "it is clear that [commissions attributable to 2006]

**Memorandum Opinion and Order**                                      11

should not have been included in determining the value of the 2007 Earn Out." *See* Application to Modify or Vacate, p. 7. Because the inclusion of the Contingent Commissions and the Supplemental Commissions in 2007 revenues was the result of the Neutral Accountant's interpretation and application of the ARAPA (as discussed more fully below), rather than an error or mistake of an undisputed fact, no basis exists to modify the Accounting Arbitration Award under either the FAA or the TGAA.

### 2. Vacatur

The Debtor relies on section 10(a)(4) of the FAA and section 171.088(a)(3)(A) of the TGAA for its argument that the Accounting Arbitration Award should be vacated. The FAA provides that an arbitration award may be vacated when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Similarly, the TGAA allows the court to vacate when the arbitrators "exceeded their powers." TEX. CIV. PRAC. & REM. CODE § 171.088(a)(3)(A).

In deciding whether an arbitrator exceeded its authority as a basis for vacatur under the FAA, the court looks to "whether the award, however arrived at, is rationally inferable from the contract," and must resolve all doubts in favor of arbitration. *Halliburton Energy Services, Inc. v. NL Indus.*, 553 F.Supp.2d 733, 754 (S.D. Tex. 2008) (citing *Am. Laser Vision, P.A.*, 487 F.3d at 259 and *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320-21 (5th Cir. 1994)). The court may not vacate an award based on "mere errors on the interpretation or application of the law, nor on mistakes in fact-finding." *Rent-A-Center, Inc. v. Barker*, 633 F.Supp.2d 245, 253-54 (W.D. La. 2009) (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987)).

The scope of an arbitrator's authority is not boundless, however. An arbitrator cannot essentially re-write the agreement between the parties by disregarding a clear, unambiguous contract provision that does not require construction or interpretation. *Collins v. Aikman Floor Coverings Corp. v. Froelich*, 736 F.Supp. 480, 484 (S.D.N.Y. 1990) (arbitration agreement expressly limited recovery of commissions to sales arising before termination of salesman's contract, but award demonstrably granted commissions on sales for a reasonable time after termination); *see also Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.*, 990 F.Supp. 304, 311 (S.D.N.Y. 1998) (award granted interest on damages component that agreement specified was not to accrue interest) and *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187-88 (8th Cir. 1987) (arbitrator exceeded authority by applying different price for gas than statutory rate set forth in contract).

Here, the Debtor first asserts that the Neutral Accountant exceeded her authority in exactly this way by including commissions attributable to 2006 in the 2007 earn-out calculation, in violation or disregard of ARAPA section 3.2(a)(iv) that prohibits counting commissions attributable to multiple years in one year. As described above, however, the Neutral Accountant did not disregard or abrogate section 3.2(a)(iv) in her determination, but instead found that the provision simply did not apply to the Contingent Commissions and the Supplemental Commissions because of her determination that the term "account" excluded payments from insurance carriers such as Travelers. Accounting Arbitration Award, at 9-10. As the Fifth Circuit noted in *Apache Bohai Corp. LDC v. Texaco China BV*, the parties here expressly bargained for the Neutral Accountant's construction of the ARAPA, and must in turn be bound by that construction. *See Apache Bohai*, 480 F.3d at 404-05; Letter Agreement, page 3 (App. R. 0003) ("[The Debtor and Curley] understand and agree that [the Neutral Accountant's] interpretation and application of the terms of the [ARAPA] will be

**Memorandum Opinion and Order** 13

based upon her judgment and expertise as an accountant."). Moreover, because the Court must defer to the arbitrator's interpretation of contract terms that are derived from the wording or purpose of the contract, the Debtor's contention that the Neutral Accountant exceeded her authority with regard to section 3.2(a)(iv) of the ARAPA does not establish a basis for vacatur. *See Apache Bohai*, 480 F.3d at 404-05.

Second, the Debtor argues that the Neutral Accountant exceeded her authority because allocation of the Contingent Commissions to the Debtor's 2007 revenue for purposes of calculating the Year 1 Earn-Out Payment essentially re-wrote the agreement between the parties by ignoring or violating section 3.1(c) of the ARAPA, which specified that 2007 revenue could only include income "generated by the Buyer." Application to Modify or Vacate, at 8; ARAPA 3.1(c). To establish a basis to vacate the Accounting Arbitration Award under this standard, the Debtor must show that the Neutral Accountant's determination clearly runs counter to the terms of the agreement between the parties, such that the ARAPA "indisputably dictates a contrary result." *See Brabham*, 376 F.3d at 385. Under the deferential standard of review applicable here, however, the Court must defer to the Neutral Accountant's interpretation of any contract terms that "are unclear, ambiguous or otherwise require[ ] construction or interpretation." *See Collins*, 736 F.Supp. at 484. Significantly, in this regard, the Court does not review the language or the reasoning used by the arbitrator, but looks only to the result reached. *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1220 n.4 (5th Cir.1990) (citing *Local Union 59, Int'l Bhd. of Elec. Workers v. Green Corp.*, 725 F.2d 264, 268 (5th Cir.), *cert. denied*, 469 U.S. 833 (1984)). "The single question is whether the award, however arrived at, is rationally inferable from the contract," that is, that the basis of the award is derived from the wording or purpose of the agreement in some logical way. *Id*.

To reach the result contained in the Accounting Arbitration Award, the Neutral Accountant must have concluded that the Contingent Commissions were generated by the Debtor in 2007, rather than by Curley in 2006. *See* ARAPA, § 3.1(c). Thus, if the determination that the Debtor "generated" the Contingent Commissions is logically derived in any way from the wording or purpose of the ARAPA, the Neutral Accountant's award must be confirmed. To decide what is rationally inferable from the underlying contract, the Court must look to the usual state-law rules of contract interpretation. *See Harris v. Parker College of Chiropractic*, 286 F.3d 790, 793 (5th Cir. 2002). In construing contracts, Texas law requires that courts ascertain and give effect to the parties' intentions as expressed in the document. *Lopez v. Munoz, Hockema & Reed, Ltd. Liability P'ship*, 22 S.W.3d 857, 861 (Tex. 2000).

The ARAPA does not define the terms "generate" or "generated," and there appears to be no legal definition of the term. *See, e.g.,* BLACK'S LAW DICTIONARY 707 (8th ed. 2004). Webster's defines "generate" as "to cause to be : bring into existence." WEBSTER'S THIRD NEW WORLD DICTIONARY (UNABRIDGED) 945 (1993). Under the express terms of the Letter Agreement, the Debtor and Curley agreed that the Neutral Accountant would interpret and apply the terms of the ARAPA based upon her judgment and expertise as an accountant. Letter Agreement, page 3 (App. R. 0003). Further, the Letter Agreement expressly states that "[t]o the extent the [ARAPA] does not otherwise define the basis for computation of EBITDA or Earn Out EBITDA or define a component used to derive those amounts, the Neutral Accountant will refer to generally accepted accounting principles in the United States (US GAAP)." Letter Agreement, page 2 (App. R. 0002). As expressed in the ARAPA, the parties clearly intended for any uncertainties or ambiguities in

contract terms to be construed under GAAP; and thus, an interpretation of the term "generated" pursuant to that standard would logically follow from the letter and purpose of the ARAPA.

Under GAAP, revenue is generally recognized and recorded only when "it is realized or realizable and earned." SEC Staff Accounting Bulletin No. 101, Release No. SAB 101 (Dec. 9, 1999). Revenue is considered earned when four criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable, and (iv) collectibility is reasonably assured. *Id*. Considering the Contingent Commissions under this standard, two out of the four factors–a fixed, determinable price and reasonable assurance of collectibility–only arose in 2007, after the operations of CIG had been assumed by the Debtor. As noted previously, both the Debtor and CIG concluded that GAAP required recognition of the Contingent Commissions only upon receipt. Debtor's Responses to Questions Posed by Neutral Accountant, at 12 (App. R. 2282) and Curley's Responses to Neutral Accountant's Questions, at 6 (App. R. 2607). On this basis, the Neutral Accountant could have logically determined that the Contingent Commissions were "generated" by the Debtor when the commissions were "earned" under GAAP, since under that standard the commissions revenue did not come into existence until 2007. Because this determination follows logically from the letter of the ARAPA, the Neutral Accountant's Award is rationally inferable from the agreement, and is thus entitled to deference "even if [the court] does not agree with the arbitrators' interpretation of the contract." *See Anderman/Smith Operating Co.*, 918 F.2d at 1218. Moreover, even if the Neutral Accountant erred in interpreting the term "generated" as equivalent to "earned" under GAAP, this error would still not require the Accounting Arbitration Award to be set aside, "since neither error nor clear error nor even gross error is a ground for vacating an award." *IDS Life Ins. Co. v. Royal*

**Memorandum Opinion and Order** 16

*Alliance Assocs., Inc.*, 266 F.3d 645, 650 (7th Cir. 2001) (citing *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 510 (2001)). In sum, the Debtor has not met its burden to show that the terms of the ARAPA "indisputably dictate" a contrary result, since it was within the Neutral Accountant's authority–both under statute and under the express terms of the ARAPA–to interpret the term "generated by the Buyer" in the context of GAAP.

Lastly, the Debtor's assertion that the Accounting Arbitration Award must be set aside as imperfect and incomplete because the Neutral Accountant did not specifically address section 3.1(c) in her explanations has no merit. First, the Debtor has presented no evidence to show that the Neutral Accountant ignored or overlooked section 3.1(c) in her analysis. In fact, the record submitted by the parties shows that the Debtor fully developed its arguments related to section 3.1(c) of the ARAPA to the Neutral Accountant, and that the Neutral Accountant posed specific inquiries to both parties concerning the Contingent Commissions and the computation of revenues as defined by section 3.1(c). Neutral Accountant's Questions for Buyers and Sellers, at 1; 7 (App. R. 2234; 2240); Debtor's Responses to Questions Posed by the Neutral Accountant, at 12 (App. R. at 2282). Second, arbitrators are not generally required to provide any rationale for their determinations, except to the extent required by agreement, which the Neutral Accountant did. *See Anderman/Smith Operating Co.*, 918 F.2d at 1220 n.4. Lastly, under the FAA, vacatur is only appropriate when the arbitrator "so imperfectly executed [its powers] that a mutual, final, and definite award upon the subject matter submitted was not made." In this context, the terms "mutual" and "final" require that the arbitrator must have resolved the entire dispute (to the extent possible) submitted for resolution, while "definite" requires that the award be sufficiently clear and specific to be enforced. *IDS Life Ins. Co.*, 266 F.3d at 650. Here, the Debtor has asserted no facts that show that the Neutral

**Memorandum Opinion and Order** 17

Accountant failed to arbitrate the entire controversy, nor that the terms of the Accounting Arbitration Award are so ill-defined that it cannot be enforced.

## V. CONCLUSION

Because the Debtor has not met its burden of proof to establish a statutory basis under the FAA or the TGAA to modify or vacate the Neutral Accountant's determination, the court must confirm the Accounting Arbitration Award. Accordingly, the Accounting Arbitration Award shall be confirmed in the amount of $6,282,870.19.