U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed March 2, 2010**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEXANS CUSO INSURANCE GROUP, LLC, | § | CASE NO. 09-35981-BJH-11 |
| | § | |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

    A.    **Debtor's Purchase of Curley Insurance Group, LLC from Kevin Curley, Curley's Termination, and the Employment Arbitration**

On January 3, 2007, Curley sold the assets of Curley Insurance Group, LLC; Heartland

Marketing Group, Inc.; KMC Insurance Services, Inc.; NCIS, Ltd.; NCIS Management, Inc.

("NCIS"); CEIS, Ltd.; CEIS Management, LLC; and Galway Financial Services (collectively, "CIG")

to Texans CUSO Insurance Group, LLC ("the Debtor") and Texans CUSO Partners, LLC[1] under the Amended and Restated Asset Sale and Purchase Agreement ("ARAPA"). Debtor's Ex. 1 ("ARAPA"), at 1-3. Pursuant to the ARAPA, the Debtor assumed the operations of CIG, with Curley to manage and direct those operations as the Debtor's President during a three-year "earn-out" period from January 1, 2007 through December 31, 2009 (the "Earn-Out Period") specified in the ARAPA and in a separate employment agreement (the "Employment Agreement") between the Debtor and Curley. ARAPA, at 13 § 3.1; Debtor's Ex. 6 ("Employment Agreement"), at 2 § 2. The purchase price for CIG was composed of an initial cash payment of $19 million, plus an additional amount of up to $21 million to be paid in three annual earn-out payments (collectively, the "Earn-Out Amount") calculated pursuant to a formula based upon the Debtor's earnings and revenue growth during the Earn-Out Period.[2] ARAPA, at 13 § 3.1(a).

On April 27, 2007, less than four months into the first year of operations under these agreements, the Debtor terminated Curley's employment. Curley Ex. 1, at ESTIMATION00001218; Debtor's Ex. 126, at 4. Curley disputed the appropriateness of his termination. Debtor's Ex. 126,

---

[1] Texans CUSO Partners, LLC is a holding company that owns the Debtor and has no independent operations. ARAPA, at 3; Transcript of Estimation Hearing, Jan. 14, 2010 at page 55, lines 7-16. Hereinafter, the Court will cite to the transcript of the Estimation Hearing by referencing TR, followed by the date of the testimony, followed by the page number of the transcript, followed by the line reference. So, the above transcript cite would be as follows: TR, Jan. 14, 2010 at 55:7-16.

[2] While the ARAPA contains arguably inconsistent provisions regarding who is obligated to pay the Earn-Out Amount to Curley, *compare* § 3.1(c), which provides that "Texans [defined to be the Debtor's parent] shall guarantee the obligations of [the Debtor] to make the Earn Out Payments [defined as all three payments] and any failure of [the Debtor] to timely make any of the Earn Out Payments shall constitute a material breach of this Agreement." *with* § 3.2(b)(i), which provides that "Texans shall pay" the "Year 1 Earn Out Payment," and §§ 3.2(b)(ii) and (iii), which provide that "[the Debtor] or Texans shall pay" the "Year 2 Earn Out Payment" and the "Year 3 Earn Out Payment," respectively, the Court held a status conference with the parties on March 1, 2010, at which time counsel for the Debtor confirmed that the Debtor had not argued, and is not now arguing, that the Debtor is not contractually liable to make the Earn Out Payments. However, counsel for the Debtor reiterated that the Debtor's obligation to make the Earn Out Payments is subject to the Debtor's right of offset pursuant to § 10.6 of the ARAPA and the Debtor's right to contest the calculation of the correct amount of those payments in accordance with the terms of the ARAPA.

at 4. Pursuant to the ARAPA, the parties entered into binding arbitration on this issue (the

"Employment Arbitration"), and the arbitrator returned an award on July 8, 2008, finding that Curley

had been terminated without cause and was therefore entitled to reinstatement with back pay and

benefits, along with pre-judgment interest (the "Employment Arbitration Award"). Debtor's Ex.

126, at 14.

> ### B. The Debtor's Purported Reinstatement and Re-termination of Curley, the Accounting Arbitration, and the Ensuing State Court Litigation

As described in more detail below, from July through September 2008, Curley and the Debtor

exchanged a number of communications regarding Curley's reinstatement. During this time, the

Debtor also took some actions to prepare for Curley's reinstatement, and delivered to Curley a new

organizational chart that indicated certain positions that had before reported to Curley, as the

Debtor's President, now reported to the Debtor's Chief Financial Officer. The most hotly contested

item between the parties at this time, however, was the Debtor's insistence that Curley address and

resolve a number of issues, both from his brief tenure with the Debtor and from on-going business

disputes. Curley objected to having to address and resolve these issues as improper conditions on

his reinstatement. Ultimately, the Debtor demanded that Curley meet with the Debtor's Board of

Managers on September 2, 2008. When Curley failed to appear for the meeting, the Debtor

purported to terminate Curley a second time on September 25, 2008. Curley contends that he was

never actually reinstated following the Employment Arbitration.

On February 29, 2008, while the Employment Arbitration was still on-going, the Debtor

informed Curley that its calculation of the earn-out payment for the first year under the ARAPA (the

"Year 1 Earn-Out Payment") was zero. Curley objected to the Debtor's calculation and, pursuant

to the ARAPA, the parties entered into a separate arbitration proceeding on the issue of the

**Memorandum Opinion and Order** 3

calculation of the Year 1 Earn-Out Payment (the "Accounting Arbitration").  On June 16, 2009, the arbitrator in the Accounting Arbitration issued a determination that the Year 1 Earn-Out Payment due under the ARAPA was $6,282,870.19 (the "Accounting Arbitration Award").

On August 4, 2008, Curley filed suit in state district court to confirm the Employment Arbitration Award and to recover the attorneys' fees he had incurred in connection with the Employment Arbitration (the "State Court Action"), to which Curley later added various other claims, including breach of contract for alleged violations of the ARAPA and the Employment Agreement, and breaches of fiduciary duties by the Debtor.  On June 19, 2009, Curley also filed an application in the State Court Action to confirm the Accounting Arbitration Award.  The parties were set for trial in the State Court Action on Curley's claims in relation to the Employment Arbitration Award, the Accounting Arbitration Award, the ARAPA, and the Employment Agreement on November 9, 2009.

### C.    Debtor's Chapter 11 Petition and Motion to Estimate Claims

On September 5, 2009, the Debtor filed a voluntary petition under Chapter 11 in this Court, thereby commencing this bankruptcy case (the "Case"), which stayed the State Court Action.  At a hearing held on November 11, 2009, the Court granted the Debtor's motion to estimate the amount of Curley's claim for purposes of allowance and voting under 11 U.S.C. § 502(c), and entered an Order on December 21, 2009 that detailed the estimation procedures ultimately agreed upon by the parties (the "Estimation Procedures").

Pursuant to the Estimation Procedures, the parties agreed that this Court would rule on certain of the issues pending in the State Court Action including: (i) whether the Accounting Arbitration Award should be confirmed, and (ii) whether Curley was entitled to recover the

attorneys' fees he incurred in enforcing his rights under the Employment Agreement. In separate Memorandum Opinions and Orders issued on December 30, 2009 and January 11, 2010, respectively, this Court (i) confirmed the Accounting Arbitration Award, concluding that Curley was entitled to recover $6,282,870.19 as the Year 1 Earn-Out Payment, and (ii) ruled that Curley was entitled to recover the attorneys' fees and expenses he incurred in the Employment Arbitration,[3] with the amount of such fees and expenses to be determined as part of the Estimation Hearing.

Pursuant to the Estimation Procedures, the parties conducted limited discovery and submitted pre-hearing briefs. The Court heard fact and expert testimony on January 14 and 15, 2010, and the parties submitted post-hearing briefs and proposed findings of fact and conclusions of law on January 27, 2010. The estimation of Curley's claim against the Debtor is a contested matter pursuant to Federal Rule of Bankruptcy Rule 9014. This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II.    CONTENTIONS OF THE PARTIES

### A.    Curley's Claim for Damages

On November 30, 2009, Curley filed a proof of claim (Claim No. 3-1) in the Case. On January 6, 2010, Curley filed an amended proof of claim (Claim No. 3-2) for $23,457,945.21. For estimation, however, Curley now asserts a right to recover $22,270,277.76 from the Debtor. *See*

---

[3] In his motion for summary judgment filed in the State Court Action, Curley sought only the attorneys' fees and expenses incurred during the Employment Arbitration. *See* Memorandum Opinion and Order, Jan. 11, 2010, at 3. Here, however, Curley seeks to recover the fees and expenses he incurred during the Employment Arbitration and the additional fees and expenses he incurred in connection with the State Court Action through August 31, 2009. *See* section IV.D *infra*.

Curley Post-Hearing Brief, at 2-3.[4] Curley calculates his claim as follows: (i) damages of $347,699.05 for back pay and benefits due under the Employment Agreement together with pre-judgment interest; (ii) the Year 1 Earn-Out Payment of $6,282,870.19, as confirmed by this Court; (iii) damages of $13,837,699.52, representing the additional amounts Curley contends he would have earned pursuant to the earn-out calculation required by the ARAPA but for his wrongful termination by the Debtor; and (iv) attorneys' fees and expenses of $1,802,009.00. *Id*. at 2-3; *see* TR, Jan. 15, 2010 at 143:8;154:4.

### B.    The Debtor's Contentions and/or Claims for Offsets

The Debtor asserts that Curley's claim should be estimated at zero for several reasons. Recognizing that the Court has already confirmed that Curley holds an allowable claim of $6,282,870.19 for the Year 1 Earn-Out Payment, the Debtor contends that this amount (and any other amounts estimated to be due to Curley here) is subject to offsets to the purchase price that the Debtor paid to acquire CIG. Specifically, the Debtor contends that any claim Curley has against the Debtor must be offset by adjustments to the purchase price for CIG of: (i) $4.3 million to $6.3 million[5] for the Debtor's loss of earnings from one of CIG's business units, NCIS, because of Curley's acts to shut down the operations of NCIS; and (ii) $3.1 million for the value of revenues

---

[4] The amount sought by Curley in other places is different – *i.e.*, $21,790,276.76. *See* Curley Post-Hearing Brief, at 1; 34. As discussed in more detail in section IV.D *infra*, at least a portion of this $480,001.00 difference (specifically, $470,729.00) relates to Curley's claim for attorneys' fees and expenses incurred following the Employment Arbitration in connection with the State Court Action. The Court cannot explain the additional $9,272.00 discrepancy.

[5] The Debtor calculates this range of damages by applying the multiple of seven times earnings used to value CIG before the purchase to earnings attributable solely to NCIS. The high end of the range is based on the pro forma revenue of $907,343.00 for NCIS prepared during the due diligence performed in preparation for the sale ($907,343.00 x 7 = $6,351,401.00). *See* Curley Ex. 156, at CULS/TIG 0268. The low end of the range is based on Curley's assertion at the Estimation Hearing that NCIS generated approximately thirteen percent of CIG's total revenues. TR, Jan. 15, 2010 at 164:10-12. To reach this figure, the Debtor applied thirteen percent to the total pro forma revenues for CIG, $4,717,748.00, then multiplied the result by seven (13% x $4,717,748.00 x 7 = $4,293,150.68). *See* Debtor's Post-Hearing Brief, at 29 n.13; Curley Ex. 156, at CULS/TIG 0265.

from a number of large insurance agents that "went direct" shortly after the purchase of CIG, since Curley allegedly knew of these planned departures but failed to disclose this fact to the Debtor before closing.

The Debtor also contends that Curley's claim should be estimated at zero because (i) Curley is not entitled to any further damages for the Debtor's alleged breach of the Employment Agreement because Curley was reinstated in accordance with the Employment Arbitration Award and was subsequently terminated for cause; (ii) as a matter of law, Curley's claims for damages are either too speculative to be recoverable or, alternatively, are unsupported by evidence because the expert testimony Curley presented must be stricken; and (iii) the attorneys' fees and costs claimed are unreasonable and in excess of the amount due under Curley's fee agreement with his counsel.

## III.   APPLICABLE LAW

Section 502(c) of the Bankruptcy Code provides:

There shall be estimated for purpose of allowance under this section-
(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
(2) any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c). Although the court may estimate contingent or unliquidated claims under whatever method it finds best suited to the particular contingencies at issue, principal consideration must be given to the underlying purposes of the Bankruptcy Code. *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 155 (D. Del. 2005).

Here, estimation is particularly appropriate to "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions." *In re Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992). The

fixing or liquidation of Curley's claim is essential to the administration of the Case since his claim potentially represents by far the most significant non-insider claim against the Debtor.  Apart from Curley's personal claim and a related claim by Scaffolding Industry Insurance Company RRG, Inc. ("SIIC"),[6] the claims in the Case consist of less than $10,000.00 in unsecured trade debt and an outstanding secured loan of $15,171,441.22 from Credit Union Liquidity Services, LLC ("CULS"), an affiliate of the Debtor.  In short, until the amount of Curley's claim is determined for purposes of allowance and voting in accordance with Section 502(c) of the Bankruptcy Code, no party is able to propose a meaningful plan of reorganization in the Case.

The goal of estimation is to reach a reasonable valuation of the claim as of the date of the bankruptcy filing.  *In re Owens Corning*, 322 B.R. 719, 721-22 (D. Del. 2005) (citing *In re Brints Cotton Mktg.*, 737 F.2d 1338 (5th Cir.1984)).  In reaching this goal, the court is bound by the substantive law that governs the ultimate value of the claim.  *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982).  Thus, claims based on alleged breaches of contract must be estimated under accepted contract law principles, in accordance with the general rule that state law determines the validity and amount of claims.  *Id*.

Here, both the Employment Agreement and the ARAPA specify that their terms will be governed by and construed under Texas law.  Employment Agreement, § 10(j); ARAPA, § 12.7. Because both Curley's claim for damages and the Debtor's assertions of offsets arise from alleged breaches of the ARAPA and the Employment Agreement, Texas contract law will govern the valuation of the claim and any related offsets.

---

[6] As discussed in more detail below, SIIC is an entity owned or controlled by Curley that was not sold to the Debtor, but that had significant continuing business relationships with the Debtor after the sale. *See* section IV.C.1 *infra*; *see also* Curley Ex. 156, at 2; 8.

Under Texas law, the essential elements of a breach of contract claim are: (i) the existence of a valid contract; (ii) performance or tendered performance by the claimant;[7] (iii) breach of the contract by the counter-party; and (iv) damages sustained by the claimant as a result of the breach. *See, e.g., Smith Int'l, Inc. v. Egle Group, Ltd. Liab. Co.*, 490 F.3d 380, 387 (5th Cir. 2007). Breach of contract occurs when a party fails to perform a duty required by the agreement. *Id.* Whether a party's conduct constitutes a breach is a pure question of fact, while the proper method to measure damages is question of law for the court. *Flint Hills Res., Ltd. P'ship v. Jag Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009); *Texas South Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 261 (Tex. App. 2008).

## IV. LEGAL ANALYSIS

### A. Breach of the Employment Agreement

Curley's claim for damages is based on amounts he contends that he is owed as a result of the Debtor's breach of the Employment Agreement by failing to reinstate him in accordance with the terms of the Employment Arbitration Award. Curley Post-Hearing Brief, at 2-3. Specifically, Curley contends that if the Debtor had properly reinstated him to his position as the Debtor's President, then he would have (i) received his full pay and benefits for the Earn-Out Period, and (ii) ensured that the Debtor achieved sufficient levels of revenue and earnings growth to generate a total Earn-Out Amount of $20,120,569.71 under the ARAPA.

In contrast, the Debtor contends that Curley is entitled to none of these amounts because (i) it properly reinstated Curley in accordance with the Employment Arbitration Award, and (ii) thereafter terminated Curley for cause. In short, according to the Debtor, it did not breach the Employment Agreement and Curley is not entitled to recover any further damages.

---

[7] Here, the first two elements are not in dispute.

Thus, the threshold issue this Court must decide in order to estimate Curley's claim is whether the Debtor reinstated Curley to his position as the Debtor's President in accordance with the terms of the Employment Arbitration Award and the Employment Agreement.  Based on the evidence presented, the Court finds that the Debtor did not reinstate Curley, as explained more fully below.

### 1.   The Debtor's Purported Reinstatement and Re-termination of Curley

### a.   The Debtor's Preparations for Curley's Return

At the Estimation Hearing, the Debtor presented evidence that it took several actions to prepare for Curley's return to work following the Employment Arbitration Award.  First, the Debtor assigned Curley an employee number, provided him an employee handbook, and placed him on the payroll effective August 22, 2008.  TR, Jan. 14, 2010 at 15:25 - 16:4; 36:9.  The Debtor also activated some office systems for Curley and ordered business cards that listed Curley's title as the Debtor's President.  TR, Jan. 14, 2010 at 16:10-12; Debtor's Ex. 56.  Lastly, the Debtor prepared an office for Curley, although it was significantly smaller than his previous office, which was then being used for storage.  TR, Jan. 14, 2010 at 16:10; 254:5 - 9.

### b.   Changes to the Debtor's Management Structure

At Curley's request, and in preparation for his reinstatement, the Debtor provided Curley with a new organizational chart for management of the Debtor's operations.  TR, Jan. 15, 2010 at 218:17-24; Curley Ex. 143.  Under the new organizational structure, Kevin Stewart ("Stewart"), who had previously been the Chief Financial Officer for the Debtor's parent company, Texans CUSO

Partners, LLC, would be the Debtor's Chief Financial Officer ("CFO").[8]  Moreover, this new structure contemplated that Stewart, as the Debtor's CFO, would be on a parallel reporting level as Curley, the Debtor's President.  Curley Ex. 1, at ESTIMATION00001587.001248; Curley Ex. 143. The Debtor's new organizational structure also contemplated that the Debtor's controller and vice-president for human resources ("H.R."), two functions that had before reported to Curley, would now report to Stewart. *Id.*; Debtor's Ex. 126, at 5-6.

Notably, these were precisely the two areas where significant conflicts had occurred between Curley, on the one hand, and Stewart and Gary Kirkindoll ("Kirkindoll"),[9] on the other hand, under Curley's management of the Debtor, and where the arbitrator in the Employment Arbitration had found that Stewart's involvement had actively undermined Curley's authority as the Debtor's President.  Debtor's Ex. 126, at 5-6 (finding that the Debtor's interference with Curley's instructions to the controller and head of H.R. "systematically undermined" Curley's authority).  Further, these were areas of key concern to Curley under the Employment Agreement and the ARAPA.  TR, Jan. 15, at 219:25 - 220:1-3 (Curley Direct) ("They had taken away financials.  They had taken away H.R. ...  This was not the employment agreement I signed on 1/3 of '07.  I wouldn't have signed it if this was the organizational chart.").

### c.    Communications Between Curley and the Debtor

On July 15, 2008, Curley arrived at the Debtor's offices to return to work, but was met by an executive of the Debtor who told Curley that further issues remained to be worked out among the

---

[8]  Stewart's exact role during Curley's tenure is unclear.  Although Stewart himself claimed that he was appointed CFO for the Debtor in mid-December 2006, Kirkindoll asserted that Stewart was the CFO for Texans CUSO Partners, LLC.  Curley Ex. 1, at ESTIMATION00001587.001892; ESTIMATION00001587.001248.

[9]  Kirkindoll was the Chief Executive Officer ("CEO") of Texans CUSO Partners, LLC, and of the Debtor. Kirkindoll also served on the Board of Managers of each entity.  Curley Ex. 1, at ESTIMATION00001587.001244-ESTIMATION00001587.001245; TR, Jan. 14, 2010 at 55:7 - 57:5; Debtor's Ex. 126, at 2.

parties' attorneys and that the Debtor was not ready for Curley to return to work.  TR, Jan. 14, 2010 at 22:12 - 24:15.  On August 6, 2008, the Debtor sent Curley a letter informing Curley that his reinstatement would become effective on September 1, 2008 (the "August 6 Letter").  Debtor's Ex. 22, at 1.  However, the August 6 Letter also set out a three-page list of items and issues for which the Debtor sought "clarification or resolution."  *Id.* at 2-4.  The August 6 Letter further required Curley to meet with a member of the Debtor's Board of Managers, David Addison ("Addison"), and to respond to the detailed items within twenty-one days, with a final warning that Curley's "failure to satisfactorily and objectively address and resolve these issues" could subject him to suspension and/or termination.  *Id.* at 2.

In a reply dated August 27, 2008, Curley objected to any conditions or limitations to his reinstatement and assumption of "day-to-day operating control" of the Debtor's business operations. Debtor's Ex. 23, at 2.

The Debtor responded the next day (August 28, 2008) with a letter that stated that there were no limitations or conditions upon Curley's reinstatement, but also demanded that "if [Curley was] ready to be reinstated," Curley meet with the Board of Managers at 9:00 a.m. on September 2, 2008 to discuss the items in the August 6 Letter.  Debtor's Ex. 24, at 1 -2.

In a letter sent by Curley's counsel to counsel for the Debtor on September 1, 2008, Curley declined to meet with the Board of Managers until Curley first "had an opportunity to assess the current operational state of [the Debtor]."  Debtor's Ex. 27, at 2.

When Curley did not appear for the September 2, 2008 meeting, TR, Jan. 14, 2010 at 18:2-3; 46:4-6, the Debtor sent Curley a letter dated September 3, 2008 that informed Curley that his failure to attend was insubordination (the "September 3 Letter"), and that his employment was suspended,

with full pay and benefits, until September 17, 2008.  Debtor's Ex. 26, at 2.  While on suspension, Curley was prohibited from reporting to any of the Debtor's offices, contacting any employees, or accessing any of the Debtor's computer systems.  *Id.*  The September 3 Letter instructed Curley that his sole duty during the suspension period was to prepare a written response to the items from the August 6 Letter and to resolve those items.  *Id.*  Further, the Debtor informed Curley that "[i]f by September 17, 2008, you [Curley] do not address in writing and satisfactorily resolve the matters set out in the [August 6 Letter], then [the Debtor] will terminate your employment."  *Id*.

By letter dated September 25, 2008 (the "Termination Letter"), the Debtor informed Curley that his employment was once again terminated.  Debtor's Ex. 27, at 1.

### d.    The August 6 Letter Issues and the Debtor's Stated Rationales for Curley's Re-termination

The issues raised by the Debtor in the August 6 Letter included the following:

- a demand that Curley explain how he intended to "correct the business relationship" between SIIC/SIA Insurance Company RRG, Ltd. ("SIAI") and the Debtor, based on the allegation that Curley had amended the Program Management and Underwriting Agreements ("PMUAs") for these entities after closing.  The Debtor also requested a proposal from Curley on how to resolve the ongoing arbitration between SIIC and the Debtor, and SIIC's cancellation of the PMUA with NCIS, which the Debtor alleged created a conflict of interest under the Employment Agreement;[10]

- a demand that Curley reimburse certain items on his old expense reports that the Debtor alleged were improper; and

- a demand that Curley explain how he intended to resolve allegations that he had acquired

---

[10] The issues surrounding the PMUAs between SIIC and NCIS are discussed in more detail in section IV.C.1 *infra*.

unauthorized "tail insurance policies" from SIAI, which the Debtor asserted was a violation of its ethics and conduct policy. Further, the Debtor informed Curley that it had become aware of "additional facts" about the policies, and had obtained a legal opinion that they were unauthorized.

Debtor's Ex. 22, at 2-4.

In the Termination Letter, among various other reasons, the Debtor cited Curley's conduct as to the PMUAs and tail insurance policies, as well as Curley's failure to follow the Board's instructions to address the issues in the August 6 Letter and to meet with the Board, as reasons for Curley's termination. Debtor's Ex. 27, at 2-6.

Notably, the Debtor had previously raised the issues of the allegedly improper expense claims and unauthorized tail insurance policies in the Employment Arbitration as purported justifications for its termination of Curley in April 2007, but the arbitrator did not find either to constitute cause for Curley's termination under the Employment Agreement. *See* Curley Ex. 1, at ESTIMATION00001022 - ESTIMATION00001023 (Debtor's Employment Arbitration Pre-Hearing Brief); Curley Ex. 1, at ESTIMATION00001474 - ESTIMATION00001485 (Debtor's Employment Arbitration Post-Hearing Brief); Debtor's Ex. 126, at 8 -13. Although the Employment Arbitration Award contained no express ruling on whether the tail insurance policies where authorized by the applicable authorities or not, the arbitrator found no conflict of interest or ethical violation, but rather stated that "the record [was] bereft of any proof that SIAI did not pay a fair price for the policies, or that the policies did not adequately cover risks to NCIS." Debtor's Ex. 126, at 13. In fact, the arbitrator found that the policies were issued only after Curley had taken steps to ensure the fairness of the terms. *Id*.

## 2. Conclusion: The Debtor Failed to Reinstate Curley

Section 9 of the Employment Agreement provides that "[i]n the event that the Arbitrator rules in favor of [Curley], then [Curley] will be entitled *to return to his employment with the Company* [the Debtor] and be entitled to recover back pay and benefits." Employment Agreement, at § 9 (emphasis added). Because the Employment Arbitration Award found that the Debtor terminated Curley without cause, Curley was entitled to this remedy, for which "the parties specifically contracted." Debtor's Ex. 126, at 14 n.3.

Curley's employment is defined by the Employment Agreement, which provides that his duties and responsibilities include "managing and directing the operation of the business of [the Debtor]," along with "such other duties, functions, responsibilities and authority in connection with the foregoing as are commensurate with his position as President of the company, and as are from time to time delegated to him by the Board of Managers of [the Debtor]." Employment Agreement, at 2 § 1. As contemplated by the parties, this provision meant that Curley was entitled to day-to-day control of the Debtor's business operations, including the direction and supervision of all departments. Debtor's Ex. 126, at 5; Curley Ex. 1, at ESTIMATION00001587.001455 (Kirkindoll Deposition) ("Q. Was everyone supposed to report to Mr. Curley? A. Yep. Q. That was what the agreement provided for, right, people would report to Mr. Curley? A. They were reporting to Mr. Curley."). Significantly, the Debtor's Board of Managers could only add to these functions. *See* Curley Ex. 1, at ESTIMATION00001587.001456 (Kirkindoll Deposition) ("Q. What does this mean to you, this "delegated"? That means – A. It means from time to time we may delegate additional responsibilities to him."). While Curley and the Debtor's other executives were to work together to foster revenue and earnings growth, the Debtor assured Curley that "it's your operation to run."

Debtor's Ex. 126, at 3; Curley Ex. 1, at ESTIMATION00000982 (December 9, 2006 email from Kirkindoll to Curley).

The record made during the Estimation Hearing shows that the Debtor never returned Curley to the position he contracted for in the Employment Agreement as the Debtor's President. Certainly, Curley was rash in his attempt to assume his old position less than a week after the Employment Arbitration Award was issued, when the parties had just emerged from bitter and extended litigation and obvious issues remained to be resolved. However, despite its statements to the contrary, the Debtor's insistence on rehashing matters raised in the Employment Arbitration, including demands that Curley essentially admit to wrongdoing on previous expense accounts (which could, in turn, constitute cause for his subsequent termination), illustrate that the issues listed in the August 6 Letter were in fact unreasonable conditions placed on Curley's reinstatement. *See* Debtor's Ex. 22, at 4 ("Please acknowledge in writing that [the Debtor] is entitled to reimbursement from you for these expenses and that you will make such reimbursement by no later than September 1, 2008."). When Curley did not comply with these conditions, the Debtor then expressly barred him from assuming the operational control that defined his position as President under the Employment Agreement. *See* Debtor's Ex. 26, at 2.

Lastly, and perhaps most significantly, the alteration of the management structure of the Debtor's organization, which deprived Curley of control over two key areas of the business where, according to findings made during the Employment Arbitration, his authority had been improperly undermined before, clearly demonstrate that the Debtor never intended to return Curley to the position he contracted for in the Employment Agreement. *See* Curley Ex. 143; Debtor's Ex. 126, at 5-6. To fully return Curley to his position as the Debtor's President required that he be reinstated

to his previous level of authority, rather than the largely cosmetic actions taken by the Debtor, such as placing Curley on the payroll and ordering business cards. *See Sebastian v. Tex. Dep't of Corrections*, 541 F.Supp. 970, 977 (S.D. Tex. 1982) (in context of Title VII employment discrimination, appropriate reinstatement requires return to position with "same duties and responsibilities" as previously held).

For all of these reasons, the Court finds that the Debtor failed to reinstate Curley in accordance with the terms of the Employment Arbitration Award and was thus in breach of the Employment Agreement.

### B.    Curley's Claim for Damages

The general rule of damages for breach of contract is that "the complaining party is entitled to recover the amount necessary to put him in as good a position as if the contract had been performed." *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App. 2006) (quoting *Smith v. Kinslow*, 598 S.W.2d 910, 912 (Tex. Civ. App. 1980)). Further, one party's wrongful interference that prevents performance by the other party to the contract both excuses performance and entitles the non-breaching party to recover all damages sustained by reason of the breach. *Tacon Mech. Contractors v. Grant Sheet Metal*, 889 S.W.2d 666, 670 (Tex. App. 1994). Thus, Curley is entitled to recover any and all damages that are the natural, probable, and foreseeable consequence of the Debtor's conduct. *See Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 214 (5th Cir. 1998) (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981)).

### 1.    Back Pay and Benefits

Curley's claim for back pay and benefits is controlled by the terms of the Employment Agreement. Debtor Ex. 126. Curley presented expert testimony to establish that his damages for

back pay, benefits, and pre-judgment interest total $706,405.07. Curley Ex. 274. To calculate the correct amount of Curley's damages, Brad Mroski ("Mroski"), Curley's damages expert, subtracted from this total the amount that the Debtor had previously paid to Curley – *i.e.*, $346,059.55. *Id.* Further, Mroski's calculations included $12,646.47 for pension benefits under a program that the Debtor eliminated for all employees in June 2008. TR, Jan. 15, 2010 at 35:22 - 36:3. Curley now concedes that this amount must also be subtracted from the total amount of his claim. Curley Post-Hearing Brief, at 2 n.4.

While the Debtor disputes Curley's entitlement to these amounts, contending that it reinstated Curley and then properly terminated him again such that no further monies are due to Curley, with the exception of the $12,646.47 of pension benefits that the Debtor believed were improperly included, the Debtor did not dispute Mroski's calculation of these amounts under the Employment Agreement. Thus, the Court concludes that Curley is entitled to $347,699.05 in damages for back pay, benefits, and pre-judgment interest, calculated as follows: $706,405.07 (total amount pursuant to Employment Agreement) - $346,059.55 (amount already paid) - $12,646.47 (amount improperly included) = $347,699.05 (remaining amount due to Curley).

### 2. Earn-Out Amount

The largest component of Curley's claim is the Earn-Out Amount that Curley contends he would have achieved through the ARAPA had the Debtor not breached the Employment Agreement by (i) terminating him without cause, and (ii) failing to reinstate him in accordance with the terms of the Employment Arbitration Award. Curley Post-Hearing Brief, at 17. Although the Debtor contends that Curley is not entitled to damages calculated under the ARAPA based upon a breach solely of the Employment Agreement, *see* Debtor's Post-Hearing Brief at 14, this argument ignores

the scope of consequential damages, which includes losses that are the probable result of a breach as contemplated by the parties at the time they made the contract. *See Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 254 S.W.3d 508, 519 (Tex. App. 2008) (citing *Mead*, 615 S.W.2d at 687). Certainly the Debtor contemplated that a loss of earnings and revenue would result from Curley's absence from the business, since execution of the Employment Agreement by Curley was a condition precedent to the Debtor's obligations under the ARAPA. ARAPA, at § 7.9(a). Further, the Debtor unquestionably considered Curley a key person, and knew prior to the purchase of CIG that Curley was a top producer who generated as much as 90% of revenue in some areas of the business. Curley Ex. 156, at 1; TR, Jan. 14, 2010 at 139:11-13 (Kirkindoll direct) ("He [Curley] would have been the most important person at the agency."). Thus, a decrease in revenue and earnings, with a corresponding drop in the Earn-Out Amount, is clearly a "natural, probable, and foreseeable consequence" of the Debtor's breach of the Employment Agreement. *See Mead*, 615 S.W.2d at 687.

Under the ARAPA, the earn-out payment for each of the three years of the Earn-Out Period is calculated through a complex formula based in large part upon the Debtor's revenue and earnings growth from year to year. ARAPA, § 3.2(b)(i) – (b)(iii). Thus, Curley necessarily has the burden to show what the Debtor's revenue and earnings growth would have been under his management in order to establish the level of damages necessary to put him in the same position he would have been in had the Employment Agreement been performed as originally contemplated. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (benefit-of-bargain lost profits calculation "compensates for the profits that would have been made if the bargain had been performed as promised."); *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679

S.W.2d 721, 725 (Tex. App. 1984) (benefit-of-bargain damages may include lost profits analysis). Under this approach, the proper measure of damages is the difference between the anticipated value and the value actually received. *Baylor v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (citing *Formosa Plastics*, 960 S.W.2d at 49).

### a.    Legal Standard for Lost Profits

To prevail on a claim for lost profits, a litigant must: (i) demonstrate that the loss of profits was a material and probable consequence of the breach complained of; and (ii) establish the amount of lost profits with sufficient certainty. *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 725 (Tex. App. 1984). Under Texas law, lost profit damages must be established with reasonable certainty, and may not rely upon evidence that is "speculative, uncertain, contingent, or hypothetical." *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006); *see also McBeth v. Carpenter*, 565 F.3d 171, 176-77 (5th Cir. 2009). What constitutes reasonably certain evidence of lost profits is a fact intensive determination, but—at a minimum—opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Holt Atherton Ind., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

Lost profits calculations must encompass both the anticipated income from lost business activity, as well as the expenses that would have been attributable to that activity. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *see also Capital Metro. Transp. Auth. v. Cent. of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 581-82 & n. 7 (Tex. App. 2003) (considering both income projections and specific expenses when evaluating proof of lost profits). In calculating lost profits, "it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions." *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-

99 (Tex. 1938).

        **b.**        **Curley's Calculation of His Earn-Out Payment Based on Lost Profits Analysis**

At the Estimation Hearing, Mroski presented a detailed description of his calculation of Curley's damages based on what the Debtor's financial performance would have been if Curley had been reinstated and served as the Debtor's President.[11] To calculate this amount, Mroski began with CIG's historical financial performance in 2004, 2005, and 2006, and compared this performance to available industry data for the years 2004, 2005, 2006, 2007, 2008, and the first three quarters of 2009, concluding that CIG's historical performance compared favorably to the industry averages. TR, Jan. 15, 2010 at 8:2-16.

Mroski then forecasted the Debtor's net revenues for 2007, 2008, and 2009 by using the average net revenue growth rates for insurance agents and brokers of similar size to the Debtor (those having $10-25 million per annum in gross revenue), as reported in the Best Practices Study[12] published each year by Reagan Consulting, in conjunction with the Independent Insurance Agents and Brokers of America ("IIABA"). TR, Jan. 14, 2010 at 365:12-367:25; TR, Jan. 15, 2010 at 11:12-18. To forecast the effect on net revenues in 2007 from the Debtor's wrongful termination of Curley, Mroski multiplied the actual net revenues for 2006 for Curley's business ("2006 Actual Net Revenues") by the organic net revenue[13] growth rate for similar enterprises ("Average Organic Net

---

[11] Pursuant to the Estimation Procedures, Mroski did not prepare a report, but instead provided certain disclosures to the Debtor. TR, Jan. 14, 2010 at 358:22-23. The disclosures were presented for demonstrative purposes at the Estimation Hearing, but were not offered into evidence. *See* TR, Jan. 14, 2010 at 359:4-25.

[12] The Best Practices Study and the methodology used to compile the data it reports is discussed in more detail at section IV.B.2.c *infra*.

[13] At the Estimation Hearing, Mroski testified that "organic net revenue" excludes any increase in revenues derived purely from acquisitions. Audiotape: Hearing conducted 1/14/10 at 17:59:461 – 18:00:20 (on file with Court). The Court cites to the audiotape here because the official transcript omits the last three minutes of the January 14 hearing because of taping difficulties. TR, Jan. 14, 2010 at 367:25 - 368:1.

Revenue Growth Rate") for 2007 reported in the Best Practices Study, and added this result to the 2006 Net Revenues.  TR, Jan. 15, 2010 at 13:22 - 14:7.  To calculate the Debtor's forecasted net revenues for 2008 and 2009, Mroski made a similar calculation, but used his 2007 and 2008 net revenue forecasts as the base revenue amounts.  *Id.*

Next, Mroski forecasted the Debtor's expenses for the years 2007, 2008, and 2009.  For variable costs, Mroski first calculated the actual variable costs for CIG for each of the years 2004, 2005, and 2006 as a percentage of actual net revenues.  TR, Jan. 15, 2010 at 14:13 - 15:8.  Mroski then determined the average of that percentage for those three years, and applied that average to his Forecasted Net Revenues for the Debtor for 2007, 2008, and 2009 to calculate forecasted variable costs for each those years.  *Id.*  For fixed costs, Mroski used the Debtor's actual reported fixed costs for each of the years 2007, 2008, and 2009.  TR, Jan. 15, 2010 at 16:9 - 13.

Mroski then used his forecasted net revenue and forecasted expense figures to calculate the Debtor's forecasted earnings before interest, depreciation, taxes, and amortization ("EBITDA") for the years 2007, 2008, and 2009.  TR, Jan. 15, 2010 at 15:22 - 17:2.  Mroski then modified these EBITDA forecasts by applying the specific adjustments mandated by the ARAPA.[14]  TR, Jan. 15, 2010 at 17:6 - 9.  Lastly, using his calculations of the Debtor's adjusted forecasted EBITDA and forecasted net revenues, Mroski applied the formula specified in the ARAPA to determine the Year 1, Year 2, and Year 3 Earn-Out Payments that Curley would have received if he had not been wrongfully terminated.  TR, Jan. 15, 2010 at 18:8 - 16.

According to Mroski's calculations, the earn-out payments for 2007, 2008, and 2009 total

---

[14]  Mroski had previously assisted Curley in preparing calculations for the Accounting Arbitration.  According to his testimony, Mroski performed only those adjustments that the Neutral Accountant in the Accounting Arbitration determined to be correct.  TR, Jan. 14, 2010 at 349:9-19; TR, Jan. 15, 2010 at 17:10-20.

$20,120,569.71.  TR, Jan. 15, 2010 at 18:17-20.  Because Curley was terminated in April 2007, this amount includes the $6,282,870.19 previously awarded to Curley in the Accounting Arbitration, as confirmed by this Court in its prior Memorandum Opinion and Order.  TR, Jan. 15, 2010 at 18:20-22.  Thus, the additional damages that Curley asserts here as the remaining Earn-Out Amounts total $13,837,699.52 – *i.e.*, $20,120,569.71 - $6,282,870.19 = $13,837,699.52.  TR, Jan. 15, 2010 at 18:20-23.

Based upon Mroski's testimony, the Court concludes that Curley has proven his damages under the ARAPA with reasonable certainty under the circumstances.[15]  Lost profits calculations need not be exact, and data obtained from similar enterprises may be used to compute damages.  *See Howell Crude Oil Co. v. Donna Refinery Partners*, 928 S.W.2d 100, 108 (Tex. App. 1996).  Further, Mroski's damages calculations derive from objective facts and data, and CIG's historical rates of revenue and earnings growth provide a basis that is not speculative or hypothetical.  *See Holt Atherton*, 835 S.W.2d at 84; *see also McBeth*, 565 F.3d at 176-77.  Thus, the Court finds that Curley's total Earn-Out Amount damages are $20,120,569.71, which amount includes the Accounting Arbitration Award of $6,282,870.19.

### c.    The Debtor's *Daubert* Challenge to Curley's Lost Profits Analysis

In accepting Mroski's testimony as described above, the Court has obviously rejected the Debtor's challenges to Mroski's testimony under *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993) for the reasons explained more fully below.  By way of background, the Debtor challenged both Mroski's qualifications and conclusions on several grounds.

---

[15]  As noted below in addressing the Debtor's challenges to Mroski's testimony under *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993), several issues raised by the Debtor diminish the weight to be accorded to Mroski's damages calculation.  Taking these concerns into consideration in assessing the strength of Mroski's testimony, the Court still concludes that Curley has met his burden to prove his damages with reasonable certainty.

As to Mroski's qualifications, the Debtor argues that Mroski holds no insurance licenses and has no prior experience in the insurance industry.  Debtor's Post-Hearing Brief, at 17-18; TR, Jan. 14, 2010 at 351:8-15.  Further, Mroski admitted at his deposition, conducted only three days prior to the Estimation Hearing, that he did not know the precise definition of "consequential damages." TR, Jan. 15, 2010 at 23:23 – 24:8.  According to the Debtor, these deficiencies preclude Mroski from offering expert testimony here.

As to Mroski's calculations, the Debtor argues that its *Daubert* motion must be granted and this evidence stricken[16] because: (i) Mroski improperly relied upon the Best Practices Study to reach his conclusions because he lacked an understanding of the methodology used to compile the study when he did so; and (ii) the analytical gap between the Best Practices Study and Mroski's conclusions is too great to constitute competent evidence.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (court may reject opinion when link between the data and the opinion proffered is no more than unfounded assertion of expert); *see also Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 592-93 (1993) (court must make initial determination of whether methodology is valid and whether it can properly be applied to the facts at issue).  The Debtor further argues that Mroski was unaware of the Best Practices Study prior to his engagement as an expert and, as of the date of his deposition, did not know what companies were included in the survey or how those companies were selected for inclusion.  TR, Jan. 14, 2010 at 354:18-355:1.  Further, the Debtor objects that Mroski did not investigate or consider any independent cause for the decline in the Debtor's business other than Curley's termination.  TR, Jan. 14, 2010 at 356:5-10; Debtor's Post-Hearing Brief, at 16.  Lastly,

---

[16] Because no written expert report had been prepared and the Court was not aware of the substance of Mroski's testimony when the *Daubert* motion was made, the Court elected to allow Mroski to testify subject to his testimony being stricken if the Court ultimately concluded that the Debtor's *Daubert* motion was well-founded.

the Debtor argues that Mroski provided no basis to conclude that the Best Practices Study is indicative of the insurance market as a whole, rather than a subset of the highest performing agencies, or why it is appropriate to compare the rates of growth indicated in the Best Practices Study to the Debtor's operations.  Debtor's Post-Hearing Brief, at 19.

The Court disagrees with the Debtor and will thus deny the Debtor's *Daubert* motion and related motion to strike Mroski's testimony.   First, Mroski is a certified public accountant and a certified fraud examiner, with experience in calculation and review of financial damages models for litigation purposes.  Curley Ex. 275; TR, Jan. 14, 2010 at 345:3-348:1.  In the Fifth Circuit, to be qualified as an expert a witness must possess "such knowledge or experience in [his or her] field or calling as to make it appear that his opinion will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004).  Further, testimony is admissible even when the expert possesses only general rather than specific experience with the subject matter. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (certified public accountant with seventeen years experience qualified as an expert on issue of insolvency despite lack of prior experience in the health care industry or experience analyzing healthcare receivables).  Mroski's lack of experience or licensing in the insurance field is a matter that properly goes to the weight to be afforded to his testimony, not its admissibility.  *TC Sys., Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002).

Although much more troubling, Mroski's lack of knowledge about the content and methodology of the Best Practices Study at the time of his deposition is similarly a concern that bears on the weight, rather than the admissibility, of Mroski's testimony, because during the intervening three days between his deposition and his Estimation Hearing testimony, Mroski cured this

deficiency. TR, Jan. 14, 2010 at 354:18-355:22. Specifically, by the time he testified at the Estimation Hearing, Mroski was able to testify in detail about the methodology used to select the companies listed in the Best Practices Study and to answer other questions posed to him on cross-examination. TR, Jan. 15, 2010 at 10:10 – 13:18; 23:7 - 36:10.

Similarly, Mroski was able to demonstrate the analytical link between the data listed in the Best Practices Study and his conclusions. *See Joiner*, 522 U.S. at 146. Specifically, a review of CIG's operations from 2004 to 2006 showed that CIG's organic net revenue growth was better than the average rates of organic net revenue growth for companies of similar size in the Best Practices Study for 2004 and 2005, while for 2006, CIG's growth was slightly below the median.[17] TR, Jan. 15, 2010 at 9:20 – 10:9. Further, the Best Practices Study classified reported agencies by ranges of net revenue, and for the applicable reporting periods, from ten to twelve of the thirty-five agencies in the classification applicable to CIG were located in Texas. TR, Jan. 15, 2010 at 11:8-12:24. Lastly, Mroski testified that, notwithstanding the name "Best Practices," which originated from terminology in vogue at the time of the survey's founding, cases existed where insurance agencies performed at above the average level of those included in the Best Practices Study. TR, Jan. 15, 2010 at 26:18-27:1.

Lastly, the Debtor is incorrect in its contention that Mroski's conclusions included no independent analysis of causes of damages other than Curley's absence. In particular, the record indicates that Mroski's calculations took into account broad economic factors that affected the industry as a whole, including the impact of Hurricane Katrina and the deterioration of financial markets in 2009. *See* TR, Jan. 15, 2010 at 10:6-9; TR, Jan. 15, 2010 at 40:12 - 41:7 (rates of organic

---

[17] According to Mroski, in 2006, the Best Practices Study used a median, rather than average number, due to the effects of Hurricane Katrina on the reported figures. TR, Jan. 15, 2010 at 10:6-9.

revenue growth tied to levels reported by similar companies, including negative growth rate for 2009). Further, through the treatment of variable and fixed expenses, the analysis also incorporates the Debtor's actual performance during the Earn-out Period.  *See* TR, Jan. 15, 2010 at 33:11-16.

Based upon this testimony, the Court concludes that Mroski demonstrated that the Best Practices Study provides a "reliable basis in knowledge and experience" to support the admissibility of his testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592); *see also* FED. R. EVID. 702 (testimony must be based on sufficient facts or data).  Mroski's knowledge of the methodology underlying the Best Practices Study at the time he made his calculations, and the degree to which the Debtor's and CIG's operations were comparable to the insurance agencies included in the study, are issues properly addressed to the weight of the evidence, and have been considered as such.

For these reasons, the Debtor's motion to strike Mroski's testimony is denied.

**C.      The Debtor's Claims for Offsets to the Purchase Price**

The Debtor's claim for offset to Curley's damages is based on Section 10.6 of the ARAPA, which provides that the Debtor may offset any losses by the Debtor pursuant to the ARAPA "against any consideration still payable [by the Debtor]" under the agreement.  ARAPA, at 40 § 10.6**.** Essentially, the Debtor argues that Curley's actions deprived the Debtor of the value of future revenues that it bargained for in the purchase of CIG.  Debtor's Post-Hearing Brief, at 23-24.

**1.      NCIS and SIIC/SIAI**

**a.      PMUAs**

One of the CIG companies purchased by the Debtor was NCIS, which acted as a program manager for two other insurance companies owned or controlled by Curley that were not purchased

by the Debtor – *i.e.*, SIIC and SIAI.  ARAPA, at 3; § 7.14; TR, Jan. 14, 2010 at 77:3-25; 98:3-17.  The

relationship between NCIS, on the one hand, and SIIC and SIAI, on the other hand, was governed

by the PUMAs.  Debtor's Ex. 11;12.  Because SIIC and SIAI represented the only clients of NCIS,

the ARAPA obligated Curley to provide to the Debtor new five-year PMUAs between NCIS and

SIIC and NCIS and SIAI as a condition of closing.  ARAPA, at § 7.14; TR, Jan. 14, 2010 at 98:10-17.

Pursuant to the express terms of the ARAPA, these new PMUAs were to be "satisfactory to [the

Debtor] in its sole discretion."  ARAPA, at § 7.14.

NCIS entered into new five-year PMUAs, effective January 1, 2007, with both SIIC and

SAIA, in documents executed by NCIS on January 3, 2007.  Debtor's Ex. 11; 12.  Despite the fact

that execution of the PMUAs was an express condition of closing, which further appeared on a due

diligence checklist of items to be completed prior to closing, the Debtor did not review the PMUAs

until some time after its purchase of CIG.  ARAPA, at § 7.14; Curley Ex. 261, at 2; TR, Jan. 14, 2010

at 157:21-25 (Kirkindoll Direct) ("I didn't – I didn't see these agreements at closing.  I didn't see

them until some time later.").  At that point, the Debtor discovered that the new PMUAs differed in

several respects from the terms of the contracts that had previously been in place between NCIS and

SIIC/SAIA.  TR, Jan. 14, 2010 at 100:18-25 (Kirkindoll Direct).  For example, the new PMUA with

SIIC gave SIIC the ability to set the new program management fees, obligated NCIS to guarantee

client and sub-agent premium payments, limited profit-sharing on commissions to a one-year term,

and allowed SIIC to cancel the PMUA upon a change in management or ownership control at NCIS.

TR, Jan. 14, 2010 at 101:1 - 103:16.

At the Estimation Hearing, although the Debtor expressed its belief that these changes should

have been disclosed prior to closing, it offered no evidence that the PMUAs were amended after

closing or were unavailable for its review at closing. TR, Jan. 14, 2010 at 103:16 - 104:3. In fact, Curley presented uncontradicted testimony that he delivered the PMUAs to the Debtor's executives, at their request, before the closing. TR, Jan. 15, 2010 at 176:3-16. Thus, the Court finds that Curley did not breach any warranty or duty under the ARAPA in regard to the PMUAs.

### b. Cancellation of the SIIC PMUA

Unsurprisingly, in the wake of Curley's termination, significant problems developed in the relationship between NCIS (then owned by the Debtor) and SIIC/SIAI (which were still owned by Curley). TR, Jan. 14, 2010 at 104:4 - 105:9. At some point, SIIC/SIAI set the program management fees for NCIS at zero. TR, Jan. 14, 2010 at 102:10-12. Second, a dispute erupted over NCIS's authority to underwrite and bind policies through SIIC, which Curley claimed required his personal approval based on an "express warranty" contained in SIIC's reinsurance treaty with its reinsurers. TR, Jan. 14, 2010 at 199:14-19; TR, Jan. 15, 2010 at 198:1-17. The Debtor disputed this allegation, claiming that the agreement between NCIS and SIIC granted NCIS full underwriting and binding authority, and that the re-insurance treaty between SIIC and its re-insurers covered those policies. TR, Jan. 14, 2010 at 199:21 - 201:16. At the estimation hearing, Curley did not produce the reinsurance treaty or any witness with first-hand knowledge of the terms of the express warranty.

Nevertheless, Curley asserted that the Debtor (through NCIS) bound at least fourteen insurance policies without reinsurance, and made a report to that effect to the Department of Insurance, Securities and Banking (the "Department") of Washington, D.C., where SIIC was domiciled. TR. Jan. 15, 2010 at 247:12-251:21. Based on that report, the Department issued a Cease and Desist Order effective January 11, 2008, which was subsequently amended several times (the "Cease and Desist Order"). Debtor's Exs. 14; 15; 17; 20. Because SIIC represented virtually all of

NCIS's business at that time, the Cease and Desist Order effectively shut down NCIS. TR, Jan. 14, 2010 at 206:9-14. Finally, in May 2008, SIIC (at Curley's direction as its President) terminated the PMUA with NCIS, at which time the Cease and Desist Order against SIIC was lifted. TR, Jan. 15, 2010 at 255: 9-14; Debtor's Ex. 20. Soon after, SIIC initiated an arbitration proceeding against NCIS. TR, Jan. 15, 2010 at 256:5-9. After the cancellation of the PMUA, NCIS had so little revenue that the Debtor eventually closed the business unit. TR, Jan. 14, 2010 at 44:19-45:4; TR, Jan. 14, 2010 at 212:15-23.

### c.     Debtor's Claim to Offset

Under the PMUA, either party could terminate the agreement upon a material breach by the other party that remained uncured for thirty days after written notice. Debtor's Ex. 11, at 6 § 10(i). SIIC's board minutes indicate that SIIC's directors authorized Curley, as SIIC's President, to terminate the PMUA "in the event that NCIS [did] not agree to all of the stipulations required" to lift the Cease and Desist Order, but these minutes do not state what those stipulations were. Curley Ex. 218. However, the PMUA also allowed SIIC to cancel it upon a change in ownership or control of NCIS that was unapproved by SIIC. Debtor's Ex. 11, at 6 § 10(v); TR, Jan. 14, 2010 at 102:13-23 (Kirkindoll direct).

Significantly, while the Cease and Desist Order reiterates the allegations put forward by Curley and the Debtor, it makes no express findings on whether the Debtor properly or improperly bound the fourteen policies at issue. *See* Debtor's Exs. 14; 15; 17. The Department did conclude, however, that the on-going dispute between NCIS and SIIC had created "a climate of distrust and significant lack of cooperation" that did not serve the best interests of SIIC's policyholders and the general public. Debtor's Ex. 17. Ultimately, the Department ordered that the Cease and Desist Order

would not lift until SIIC either resolved all of its outstanding issues with NCIS, replaced NCIS as its managing general underwriter with another qualified provider, or proposed some other alternative acceptable to the Department. Debtor's Ex. 17, at 3.

The Debtor asserts that Curley's conduct in filing a report with the Department without proof that policies were bound without reinsurance amounts to business disparagement, but has not established this claim. *See* Debtor's Post-Hearing Brief, at 28. First, the Debtor has not shown that Curley knew or "entertained serious doubts" about the truth of his accusation. *See Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 439 (Tex. App. 2008) (knowledge of falsity or reckless disregard of truth is required element of business disparagement claim). Second, the Debtor has demonstrated no special damages from Curley's conduct, or that Curley's report played "a substantial part in inducing others not to deal" with NCIS. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987) ("Proof of special damages is an essential part of the plaintiffs' cause of action for business disparagement.").

More importantly, the Debtor has also failed to carry its burden to demonstrate that Curley acted improperly either in making a report to the Department or in cancelling the PMUA. Although the Debtor contends that Curley made a "false report" to the Department, the language of the Cease and Desist Order does not support this allegation–instead, the Cease and Desist Order simply makes no finding on the issue. *See* Debtor's Exs. 14; 15; 17. Apart from these documents, the only evidence of the Debtor's underwriting authority, or lack thereof, are the conflicting assertions of witnesses Contreras and Curley. TR, Jan. 14, 2010 at 199:21 - 201:16 (Contreras); TR, Jan. 15, 2010 at 198:11-17 (Curley). Similarly, the Debtor has failed to allege or demonstrate that Curley's cancellation of the PMUA breached the agreement, or that Curley acted outside the scope of his legal

**Memorandum Opinion and Order**                                                                                    **31**

rights under the PMUA in any way.  *See* Debtor's Post-Hearing Brief, at 27-29; Debtor's Ex. 11, at

6 § 10 (outlining bases for cancellation).   Even assuming *arguendo* that the "stipulations" referred

to in the minutes of SIIC's Board of Managers meeting did not constitute breaches of the PMUA that

justified cancellation of the PMUA under § 10(i), Curley still had the authority to cancel the PMUA

because of the change in control of NCIS that occurred upon Curley's termination under § 10(v) of

the PUMA.  *See* Debtor's Ex. 11, at 6 § 10(i);(v).

    As noted above, despite its protestations to the contrary, the Debtor had constructive notice

of these provisions of the PMUA, as well as the opportunity and authority to cancel or delay the

purchase of CIG if these provisions were not "satisfactory to [the Debtor] in its sole discretion."  *See*

section IV.C.1.a *supra*; ARAPA, at § 7.14.   Thus, even though intentional (and perhaps even

spiteful), Curley's actions could not have deprived the Debtor of any value for NCIS that it bargained

for, since the Debtor purchased NCIS with the knowledge that Curley could essentially "turn off"

its revenues in exactly such circumstances.  It is a long-standing rule that where "parties got that

which they bargained for and were not acting under mistake, fraud, or the like, the courts do not

concern themselves with the relative values exchanged or the wisdom of the contract ...."

*Winningham v. Dyo*, 48 S.W.2d 600, 603 (Tex. 1932).

    Thus, for all of these reasons, the Court concludes that the Debtor is not entitled to any

offsetting claim.

## 2.    Agents That "Went Direct"

    The Debtor's second claim for offset is based on the assertion that Curley failed to disclose

that five large insurance agents planned to exercise their contractual option to terminate their

agreements with the Debtor in order to deal directly with Travelers' Insurance Company (a process

called "going direct"). Debtor's Post-Hearing Brief, at 29-31. As a result, the Debtor claims that it paid $3.1 million for commission revenues that were never realized, and that Curley's failure to disclose these terminations constitutes fraudulent inducement and breach of the ARAPA. *Id.*

Under § 4.16 of the ARAPA, Curley represented to the Debtor pre-purchase that "[t]o [Curley's] knowledge" no agent intended to cancel, terminate, or exercise any option under the contracts assumed by the Debtor. ARAPA, § 4.16. The Debtor asserts that Curley knew this representation was false because of information he had received a week before that indicated that five large insurance agents planned to go direct in 2007. Debtor's Ex. 44. The Debtor asserts that it relied upon Curley's representation to its detriment, notwithstanding that its own due diligence revealed the strong likelihood that several large agents planned to go direct, and that its executives had conversations with Curley about the possibility and frequency of this occurrence before the purchase. Curley Ex. 156, at 7; TR, Jan. 14, 2010 at 83:21-84:2 ("Well, we knew it was a possibility that agents could go direct."); TR, Jan. 15, 2010 at 189:15-192:19. Further, certain of the five agents the Debtor complains went direct eventually returned. TR, Jan. 14, 2010 at 135:25-136:5; TR, Jan. 14, 2010 at 313:17-20.

To establish fraud, a claimant must prove the following elements: (i) a material representation was made; (ii) the representation was false; (iii) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (iv) the speaker made the representation with the intent that the other party should act upon it; (v) the party acted in reliance on the representation; and (vi) the party thereby suffered injury. *Matis v. Golden*, 228 S.W.3d 301, 305-06 (Tex. App. 2007). In the context of a fraud claim, the representation must have been intended to induce some action. *Id.* at 310 (citing *Burleson State Bank v. Plunkett*,

27 S.W.3d 605, 613 (Tex. App. 2000)). Intent is determined at the time the party made the representation. *Id*. Whether the requisite intent existed is a question of fact. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Although a failure to perform due diligence in reliance upon a misrepresentation does not bar recovery, *Koral Indus. v. Security-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990), Texas law recognizes that "where a person makes his own investigation of the facts, or relies on expert opinions he has himself obtained, he cannot sustain a cause of action based upon misrepresentations by others." *Ehler v. St. Paul Fire & Marine Ins. Co.*, 66 F.3d 771, 774 (5th Cir. 1995) (quoting *Kolb v. Texas Employers' Ins. Assoc.,* 585 S.W.2d 870, 872 (Tex.Civ.App. 1979)).

Here, the Debtor has failed to establish several key elements. First, the Debtor has not shown that Curley knew that his representation was false, or that Curley made the representation with reckless disregard for its truth. As Curley testified, and the Debtor's actual experience corroborated, the number of agents who actually went direct in any one year was always uncertain, and could not be determined simply from the number of agents who expressed an intent to go direct. TR, Jan. 15, 2010 at 190:7-18; 193:23-194:7. This fact further casts doubt on whether Curley's representation was even objectively false when made.

Second, the Debtor has not demonstrated that Curley intended to induce the Debtor to take or refrain from some act, such as adjusting the purchase price. *See* TR, Jan. 14, 2010 at 83:13-87:10 (Kirkindoll Direct) (repeatedly expressing belief that disclosure should have been made, but ascribing no motive). Instead, the record is clear that Curley made all of the relevant contracts available to the Debtor before the purchase, and was open and forthcoming with the Debtor's executives about the issue. TR, Jan. 15, 2010 at 189:15-192:19. There is no indication that the representation in the

ARAPA was made with the intent to conceal any information from the Debtor, and it is difficult to see what Curley could have hoped to gain in any event, since any subsequent loss in revenues from the lost agents would ultimately impact Curley's Earn-Out Amount.  *See* ARAPA, at § 3.2.

Lastly, the Debtor has failed to prove that it in fact relied upon Curley's representation in the ARAPA, rather than upon its own extensive due diligence, in assessing the risk of agents going direct.  *See, e.g.*, TR, Jan. 14, 2010 at 83:21-84:2; *see Ehler*, 66 F.3d at 774.

Thus, for all of these reasons, the Court concludes that the Debtor is not entitled to any offsetting claim.

### D.    Curley's Claim for Attorneys' Fees

At the Estimation Hearing, Curley presented testimony that he incurred $1,166,013.00 in fees and $165,267.00 in expenses, for a total of $1,331,280.00,[18] in pursuing his claims against the Debtor during the Employment Arbitration.  TR, Jan. 15, 2010 at 129:24-143:8.  Further, Curley seeks additional fees of $412,605.00 and expenses of $58,124.00, for a total of $470,729.00, incurred from July 8, 2008 (the date of the Employment Arbitration Award) through August 31, 2009 (the month ending prior to the commencement of the Case) in connection with enforcing the Employment Arbitration Award.[19]  TR, Jan. 15, 2010 at 154:2-11.  Together, these amounts total $1,802,009.00 in fees and expenses claimed.

Under the fee agreement (the "Fee Agreement") with Curley's counsel, Bickel & Brewer (the

---

[18]  Collins mis-spoke in his testimony, stating that these two amounts total $1,331,279.00.  *See* TR, Jan. 15, 2010 at 143:3-8.

[19]  The Employment Agreement provides that "[a]ny party who fails to perform any covenants of this Agreement shall pay to the other parties the amount of attorneys' fees and expenses it or they shall have sustained or incurred in enforcing this Agreement or seeking damages for its violation."  Employment Agreement, at 9 § 10(h).  Thus, Curley is entitled under the Employment Agreement to recover the legal fees and expenses he incurred in connection with the Employment Arbitration and any additional fees and expenses he incurred in enforcing his rights under the Employment Agreement generally.

"Firm"), Curley was billed fees at the Firm's normal hourly rates, but was only obligated to pay 50%

of the fees as they were incurred, with the remaining 50% to be "accrued and deferred (the 'Deferred

Amount') until such time as you have 'net proceeds' in excess of the discounted fees previously

billed ...." Curley Ex. 1A ("Fee Agreement"), at 2.[20] Under the Fee Agreement, Curley was obligated

to pay expenses incurred on a current basis.  Thus, as of the Estimation Hearing, Curley

had actually paid the Firm approximately $500,000.00 in fees and expenses.  TR, Jan. 15, 2010 at

146:24-147:5.

Because the Employment Arbitration Award entitled Curley to a monetary award of his back

pay and benefits, totaling approximately $300,000.00, Curley concedes that, as of the Estimation

Hearing, he was not required to pay more of the Firm's fees because he had not yet recovered

sufficient sums from the Debtor to obligate him to do so.  In other words, he had not yet received

"net proceeds" from the litigation in excess of the fees and expenses previously billed by the Firm.

TR, Jan. 15, 2010 at 147:1-13.

Given that Curley is not yet obligated to pay the outstanding balance owed to the Firm, the

Debtor contends that Curley cannot claim such sums from the Debtor.  Debtor's Post-Hearing Brief,

at 22.  Further, the Debtor contends that the fees incurred are unreasonable and excessive.  *Id.* at 22-

23.

The Court rejects the Debtor's argument that Curley has no claim based on the Deferred

Amount under the Fee Agreement.  Although Curley's obligation to pay the Firm is contingent upon

---

[20]  At the Estimation Hearing, counsel for the Debtor and Curley mistakenly thought that the Fee Agreement was
included in Curley's Exhibit 1.  Thus, although the Debtor's counsel provided the Court with a copy of the Fee
Agreement at the Estimation Hearing, the document was not admitted into evidence. After the Estimation Hearing,
once the error was discovered, the Court obtained email confirmation from both parties that the Fee Agreement was
to be admitted into evidence by agreement as Curley Exhibit 1A.  These email confirmations are on file with the
Court.

**Memorandum Opinion and Order**                                                                                      **36**

his recovery of sufficient sums from the Debtor to mature his obligation to pay, he has a "claim" against the Debtor for these amounts. The Bankruptcy Code defines "claim" broadly and, as defined, includes contingent, unliquidated, and unmatured obligations. 11 U.S.C. § 101(5)(A). Accordingly, Curley has a "claim" against the Debtor for the fees owing to the Firm under the Fee Agreement. Whether the requested fees are reasonable is a more difficult issue.[21] Curley has not produced invoices or time entries from which the Court can determine whether the time spent was reasonable and warranted. Curley did, however, admit extensive portions of the record from the Employment Arbitration into evidence, and presented the testimony of Michael Collins ("Collins"), a Firm partner, who testified about the steps taken to calculate the Firm's request for fees and expenses. *See* Curley Ex. 1; TR, Jan. 15, 2010 at 129:24 - 143:8.

According to Collins, the Firm first excluded any fees or expenses incurred after August 31, 2009, which was the month ending before the filing of the Case on September 5, 2009. TR, Jan. 15, 2010 at 130:24-131:1. One of the Firm's business consultants then reviewed the Firm's billing records to isolate time entries attributable to the Employment Arbitration. TR, Jan. 15, 2010 at 131:11-20. As a part of this process, the Firm declined to allocate any portion of $136,453.00 of time billed by partner John Bickel ("Bickel") for entries with generalized descriptions. TR, Jan. 15, 2010 at 131:23-132:2. The Firm also completely excluded all time billed by an associate and two other

---

[21] Interestingly, the Employment Agreement imposes no reasonableness requirement; it simply requires the Debtor to pay the fees and expenses incurred or sustained by Curley in enforcing it or in seeking damages for its violation. This fact was noted by Michael Collins, a Firm partner, during his testimony in support of the Firm's fees. However, Collins further noted during his testimony that "attorneys always have an ethical obligation to charge only a reasonable fee to their client." TR, Jan. 15, 2010 at 136:2-4. This observation by Collins is consistent with both the Texas Disciplinary Rules of Professional Conduct and Texas Supreme Court precedent. *See Lopez v. Munoz, Hockema & Reed, LLP,* 22 S.W.3d 857, 867 (Tex. 2000) ("Another ethical consideration that deserves mention is the lawyer's fiduciary duty not to collect an unconscionable fee from his client. A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.")(citations omitted). *See also* TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(a). Accordingly, the Court must assess the reasonableness of the Firm's fees.

timekeepers rather than attempt an allocation, in addition to writing off $59,000.00 of time for Bickel for post-arbitration entries that contained only general descriptions.    TR, Jan. 15, 2010 at 132:2-8; 154:11-15.  Collins also noted that the Firm followed its usual practice of capping fees at ten hours per day, although more time may have been expended.  TR, Jan. 15, 2010 at 155:3-13.    As to the hourly rates of professionals, Collins testified that the rates for attorneys on the case were as follows: $900.00 per hour for Bickel; $575.00 per hour for Dave McCason, a forty-year professional with bankruptcy experience; $450.00 per hour for Greggory Teeter and Daniel Skinner; and $375.00 for Matthew Last.[22]   TR, Jan. 15, 2010 at 134:1-11.  According to Collins' testimony, the Firm also charged time for Carolyn Perry, an in-house consultant, at $325.00 per hour, and Abbey Goldman, an investigator, at $250.00 per hour.  TR, Jan. 15, 2010 at 132:14-23; 134:5-12.    Finally, based on his experience as a commercial litigator and his familiarity with rates in Dallas and nationwide, Collins testified that the amount of fees and expenses sought by the Firm are fair and reasonable based on the work performed and the services provided.  TR, Jan. 15, 2010 at 135:9-136:24.

In sharp contrast, the Debtor introduced evidence regarding the amounts it had paid to its counsel in the Employment Arbitration.  Specifically, Robert Luxen ("Luxen"), of Hallett & Perrin, the Debtor's counsel in the Employment Arbitration, testified that the Debtor incurred and paid only $441,000.00 of attorneys' fees and expenses for his firm's services in connection with the Employment Arbitration.  TR, Jan. 14, 2010 at 333:18-21; 336:23-337:6.  However, Luxen provided no testimony about either the amount of hours Hallett & Perrin expended on the Debtor's behalf during the Employment Arbitration or the hourly rates of the firm's lawyers who worked on the

---

[22]  At the Estimation Hearing, the Firm provided the Court with a demonstrative exhibit that detailed the names, hourly rates, and total hours billed by each professional, but this demonstrative exhibit was not admitted into evidence.  Further, although Collins testified to some of these items, his testimony did not include the hours billed, either overall or by professional.  Thus, there is no evidence before the Court as to the time spent on the Employment Arbitration, either overall or by each professional.

Debtor's representation.  Moreover, Luxen did not break this amount out between fees and expenses.  *See* TR, Jan. 14, 2010 at 332:6 - 343:15.

So, as to the $1,331,280.00 the Firm incurred during the Employment Arbitration for which it seeks reimbursement here, the question becomes, is it reasonable for Curley to have incurred fees and expenses that are approximately three times the fees and expenses incurred by the Debtor in connection with the same dispute?  Moreover, are the $470,729.00 of additional fees and expenses incurred by Curley after the date of the Employment Arbitration Award through August 31, 2009 reasonable?

As noted above, in estimating a claim, the court is bound by the substantive law that governs the ultimate value of that claim.  *Bittner*, 691 F.2d at 135.  Under Texas law, a prevailing party in a breach of contract action may recover reasonable attorneys' fees.  TEX. CIV. PRAC. & REM.CODE § 38.001.  The burden of proof is on the party seeking attorneys' fees to prove their reasonableness. *Sharif v. Wellness Int'l Network, Ltd.*, No. 3:05-CV-01367-B, 2008 WL 2885186 (N.D. Tex. July 22, 2008).  The general rule in Texas, applicable to an attorney's testimony as to the reasonableness of fees, is that the uncontroverted testimony of an interested witness does nothing more than to create an issue of fact, unless the testimony "is not contradicted by any other witness, or attendant circumstances" and is clear, direct and positive, and free from contradiction.  *In re Frazin*, 413 B.R. 378, 415 (Bankr. N.D. Tex. 2009) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694 (Tex. 1986) and quoting *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990)).

Here, the Court finds that Collins' testimony falls under the general rule, rather than the exception, since the "attendant circumstances" – *i.e.*, the great discrepancy between the amounts incurred by the Debtor and Curley during the Employment Arbitration, cast doubt on the

reasonableness of the Firm's fees for the Employment Arbitration.  Thus, whether the Firm has carried its burden to prove the reasonableness of its fees is an issue of fact for the Court to determine. *See Frazin*, 413 B.R. at 415.

In *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), the Texas Supreme Court identified the factors to be considered in determining the reasonableness of an attorneys' fees request: (i) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (ii) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (iii) the fee customarily charged in the locality for similar legal services; (iv) the amount involved and the results obtained; (v) the time limitations imposed by the client or by the circumstances; (vi) the nature and length of the professional relationship with the client; (vii) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (viii) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.  Further, the Court may take judicial notice of reasonable and customary fees, and the contents of the case file to evaluate a request for attorneys' fees.  TEX. CIV. PRAC. & REM. CODE § 38.004 (Vernon 2008); *City of Fort Worth v. Groves*, 746 S.W.2d 907, 918 (Tex. App. 1988).

Accordingly, the Court will apply the *Arthur Andersen* factors to the evidence presented to determine the reasonableness of the Firm's requested fees, first as to those incurred during the Employment Arbitration, and second as to fees incurred post-arbitration to enforce the Employment Arbitration Award, since there are significant differences in the evidence and issues raised as to each component.

### 1. Fees Incurred During the Employment Arbitration

(i) *the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly.* Here, the evidence only partially supports the reasonableness of the Firm's fees. The Employment Arbitration was similar to a full trial, with four days of testimony and extensive document production and pre- and post-hearing briefing. *See* TR, Jan. 15, 2010 at 135:2-8; *see, e.g.*, Curley Ex. 1, at ESTIMATION00000968 - ESTIMATION00001031 (pre-hearing briefs); ESTIMATION00001380-ESTIMATION00001501 (post-hearing briefs). In addition, the parties conducted at least eight depositions in connection with the Employment Arbitration. *See, e.g.*, Curley Ex. 1, at ESTIMATION00001587.000628- ESTIMATION00001587.000880 (Chanda Grabysch); ESTIMATION00001587.000881- ESTIMATION00001587.001185 (Kevin Heitzman); ESTIMATION00001587.001236- ESTIMATION00001587.001529 (Gary Kirkindoll); TR, Jan. 14, 2010 at 333:8 - 10. However, the central issue of the arbitration, whether the Debtor had cause to terminate Curley under the Employment Agreement, while fact-intensive, was not novel or particularly difficult. *See* Debtor's Ex. 126, at 7 (standard to be applied was an objective test from the point of view of a reasonable senior executive). Further, as noted above, Curley has not provided the Court with invoices or time entries to substantiate the time and labor necessary to adequately prosecute the Employment Arbitration, leaving the Court unable to independently assess the reasonableness of the requested fees. *See Frazin*, 413 B.R. at 417 (redactions to time entries made independent assessment of reasonableness impossible). Moreover, there is no evidence detailing the $165,267.00 in expenses, other than Collins' testimony providing this aggregate amount. Lastly, using the fees and expenses that the Debtor incurred as a guidepost for the time and labor required, the fact that the Firm

generated approximately three times that level of fees and expenses casts doubt on their reasonableness.  TR, Jan. 14, 2010 at 333:18-21; 336:23-337:6.

(ii) *the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer*.  Although Collins did not directly address this factor in his testimony, *see* TR, Jan. 15, 2010 at 129:24 - 156:6, the court may assume that the fees normally charged by counsel necessarily take into account the limitation on the attorneys' ability to accept or pursue other cases. *Sharif*, 2008 WL 2885186, at *3.  Since the Firm billed its usual hourly rates, *see* TR, Jan. 15, 2010 at 134:1-23, this factor is neutral.

(iii) *the fee customarily charged in the locality for similar legal services*.  Collins testified that the Firm's rates were comparable to those charged by similar firms in the Dallas area, although he noted that the hourly rates were also "New York rates." TR, Jan. 15, 2010 at 133:7-13; 150:10-15.  However, there is no evidence in the record regarding the number of hours expended by each lawyer working on the engagement.[23]

Based on this record, the Court is satisfied that the Firm charged Curley its normal hourly rates and that the rates charged are reasonable, although on the high side.  However, the Court has difficulty assessing the reasonableness of the overall fee, given the absence of evidence concerning the number of hours expended by the Firm's lawyers during the Employment Arbitration.

(iv) *the amount involved and the results obtained*.  This factor supports a recovery of fees.  As the above analysis of the Debtor's breach of the Employment Agreement demonstrates, *see* section IV.B *supra*, the damages at issue were considerable, since the disposition of the Employment Arbitration necessarily implicated the ultimate Earn-Out Amount due to Curley; and, significantly,

---

[23]  While a demonstrative exhibit that contained this information in summary form was provided to the Court, Collins did not testify about the number of hours expended by each lawyer and the exhibit was not offered into evidence.

**Memorandum Opinion and Order**                                                                              **42**

the Firm obtained an arbitration award in Curley's favor, with the arbitrator finding that Curley was terminated without cause.

(v) *the time limitations imposed by the client or by the circumstances*.    This factor is neutral, since there is no evidence of any time limitation imposed by either Curley or the circumstances of the case, as demonstrated by the protracted time period between Curley's termination and the Employment Arbitration.    *See* Curley Ex. 1, at ESTIMATION00001218 (termination letter dated April 27, 2007) and Debtor's Ex. 126, at 1 (hearing held March 9-12, 2008).


(vi) *the nature and length of the professional relationship with the client*.    The Firm represented Curley from at least May 2007, almost a year prior to the hearings in the Employment Arbitration.    *See* Curley Ex. 1, at ESTIMATION00000949 (Curley's demand for arbitration dated May 4, 2007).    Accordingly, this factor supports a recovery of fees.

(vii) *the experience, reputation, and ability of the lawyer or lawyers performing the services*. This factor also supports a recovery of fees based on Collins' testimony.    The lawyers working on this matter had appropriate levels of experience and ability.    *See* TR, Jan. 15, 2010 at 132:14 - 134:12. Moreover, the Firm enjoys a good reputation for its handling of litigation matters.

(viii) *whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered*.    This factor also supports a recovery of fees.    As noted above, the Fee Agreement is a modified contingent agreement that only obligates Curley to pay 100% of expenses and 50% of incurred fees up front, with the remainder of the fees to be payable from the net proceeds of any recovery.    Fee Agreement, at 2.    Thus, to that extent, the Firm's fees were premised on the results ultimately obtained for Curley.

Based on this analysis, the Court concludes that while several of the *Arthur Andersen* factors support the Firm's request to recover its fees, the Firm has not met its burden to prove the overall reasonableness of the $1,331,280.00 in fees and expenses claimed for its representation of Curley in the Employment Arbitration. In short, the glaring discrepancy between the fees and expenses requested by the Firm and the fees and expenses incurred and paid by the Debtor for the same arbitration has not been adequately explained. In fact, on cross-examination, Collins admitted that the fees incurred by the Debtor during the Employment Arbitration were not unreasonably low. *See* TR, Jan. 15, 2010 at 150: 19-22.

From the Court's perspective, a portion of the difference may be explained by the different hourly rates of the professionals engaged by the different parties, but even that is not clear on this record because the hourly rates of the Debtor's lawyers were not provided during Luxen's testimony. Of course, the difference may also be explained by a difference in the number of hours expended by the respective firms. But, there is no evidence of this in the record either. And, even if the Court had some evidence regarding the number of hours the Firm expended during its representation of Curley in the Employment Arbitration, the Court cannot independently assess the reasonableness of the time spent given the fact that no Firm invoices were introduced into evidence. Finally, there is no evidence that the $165,267.00 in expenses requested by the Firm were actually and necessarily incurred in its representation of Curley in the Employment Arbitration.

Accordingly, on this record it is clear that a reasonable fee for the handling of the Employment Arbitration, together with expenses, is $441,000.00, the amount incurred and paid by the Debtor. But, the Court lacks sufficient evidence from which to determine what additional amounts may constitute a reasonable fee for the Employment Arbitration or what additional expense

amounts might have been necessarily incurred. Thus, for purposes of this estimation, Curley shall be allowed a claim of $441,000.00 for the fees and expenses he incurred during the Employment Arbitration.[24]

### 2. Fees Incurred Post-Arbitration

At the outset of its analysis, the Court notes that Curley was essentially out of time[25] when the Firm came back following a lunch recess and clarified that it was seeking to recover $470,729.00 of additional fees and expenses for the post-arbitration pre-bankruptcy filing period. As a result of the time limitations imposed by the Court under the Estimation Procedures, a very limited record was made by the Firm with respect to the reasonableness of these incremental amounts.

(i) *the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly.* Here, the Court has far less evidence available to assess or even identify the work the Firm performed. For example, while extensive portions of the Employment Arbitration record were admitted into evidence, *see* Curley Ex. 1, for the post-arbitration period, the only evidence in the record regarding the work performed is Collins' testimony that the Firm filed an application in the State Court Action to confirm the Employment Arbitration Award and a motion for summary judgment. *See* TR, Jan. 15, 2010 at 138:7 - 13; 148:25 - 149:6.

---

[24] This allowance is without prejudice to the Firm's rights to collect its fees and expenses from Curley pursuant to the Fee Agreement. The Court recognizes that the Firm chose to spend most of its allotted time during the Estimation Hearing in proving Curley's right to recover consequential damages flowing from the Debtor's breach of the Employment Agreement. It is clear to the Court that the Firm simply ran out of time to fully develop the record with respect to the reasonableness of the fees and expenses it incurred in its representation of Curley in the Employment Arbitration and the State Court Action. From the Court's perspective, the fact that the Firm chose to focus its evidentiary presentation on Curley's substantial damages claim should not prevent it from recovering the amounts it is entitled to under the Fee Agreement.

[25] Pursuant to the Estimation Procedures, each side was given up to seven hours to present its case-in-chief and to refute the other party's case.

Collins did not identify the professionals who worked on the Firm's representation of Curley post-arbitration, other than to indicate that $59,000.00 of time charged by Bickel was excluded.[26]

Unlike the Employment Arbitration, however, the questions involved in the State Court Action were far more difficult. Those issues would have been similar to the issues raised in this Estimation Proceeding, which included whether (i) the Accounting Arbitration Award should be confirmed, (ii) Curley was entitled to recover the attorneys' fees he incurred in connection with the Employment Arbitration and/or the State Court Action, (iii) the Debtor breached the Employment Arbitration Award by failing to reinstate Curely's employment, (iv) the Debtor breached the Employment Agreement and/or the ARAPA, and (v) Curley was entitled to recover consequential damages flowing from such a breach.

Thus, the Court concludes that this factor, to some extent at least, supports a recovery of fees.

(ii) *the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer*. As with the fees incurred during the Employment Arbitration, the Court concludes that the fees normally charged by the Firm necessarily take into account the limitation on the attorneys' ability to accept or pursue other cases. *See Sharif*, 2008 WL 2885186, at *3.

(iii) *the fee customarily charged in the locality for similar legal services*. The analysis regarding the fees incurred during the Employment Arbitration also applies here.

(iv) *the amount involved and the results obtained*. This factor also supports a recovery of fees, under the same reasoning as that applied to the Employment Arbitration fees. Although the Firm did not obtain a result in the State Court Action due to the Debtor's bankruptcy filing, the result

---

[26] As noted above, the Firm prepared a demonstrative exhibit that contained such information, but did not offer any testimony regarding the professionals involved and did not offer the demonstrative exhibit into evidence.

**Memorandum Opinion and Order**                                                                                    **46**

of this estimation proceeding strongly suggests that Curley would have prevailed had the Case not been filed.

(v) *the time limitations imposed by the client or by the circumstances*.    As with the Employment Arbitration fees, this factor is neutral.

(vi) *the nature and length of the professional relationship with the client*; (vii) *the experience, reputation, and ability of the lawyer or lawyers performing the services*; (viii) *whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered*.  Under generally the same analysis applied to the Employment Arbitration fees, these factors tend to support a recovery of post-arbitration fees.  One difference here, however, is that other than Bickel, the Court lacks evidence as to the lawyers who continued to represent Curley in the State Court Action.

Although the Firm obviously performed work to enforce the Employment Arbitration Award, including initiating the State Court Action and filing a motion for summary judgment, on this record the Court has only the barest description of the services provided by the Firm, has no evidence as to who performed those services, and has no evidence regarding the necessity of incurring $58,124.00 of additional expenses.  *See* TR, Jan. 15, 2010 at 138:7 - 13; 148:25 - 149:6.  With no documentation to substantiate the amounts billed or expenses incurred, and without even any amount incurred by the Debtor to use for a comparison or as a starting point, the Court has no practical ability to assess the reasonableness of the claimed amount of fees and expenses of $470,729.00.    Thus, in this Court's discretion and for purposes of this estimation, Curley shall be allowed a claim of $156,909.66 (one-third of the amount requested) for the fees and expenses he incurred during the post-arbitration

**Memorandum Opinion and Order**                                                                                              **47**

pre-bankruptcy filing period.  *See Frazin*, 413 B.R. at 427 (finding one-third of time spent to be reasonable and necessary where value of work performed was uncertain).

Thus, for purposes of this estimation, the Court concludes that Curley is entitled to a claim for attorneys' fees and expenses of $597,909.66 – *i.e.*, $441,000.00 plus $156,909.66.

## V.    CONCLUSION

Based on the foregoing, the Court estimates Curley's claim at $21,066,178.42, calculated as: (i) $347,699.05 for back pay, benefits, and pre-judgment interest; plus (ii) $20,120,569.71 for Earn-Out Amount damages; plus (iii) $441,000.00 for attorneys' fees and expenses incurred during the Employment Arbitration; plus (iv) $156,909.66 for attorneys' fees and expenses incurred post-arbitration to enforce the Employment Arbitration Award.  Accordingly, pursuant to 11 U.S.C. § 502(c), Curley shall have a claim of $21,066,178.42 in the Case for purposes of allowance and voting.

**SO ORDERED**.

**### End of Memorandum Opinion and Order ###**